710 F.2d 1091
 32 Fair Empl.Prac.Cas. 944,
32 Empl. Prac. Dec. P 33,751
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO,
Defendant-Appellee.
 No. 82-1216.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 1, 1983.
 
 Raymond R. Baca, Gen. Counsel, Washington, D.C., for plaintiff-appellant.
 Laura Martin, Asst. Atty. Gen., Austin, Tex., for defendant-appellee.
 Appeal from the United States District Court for the Western District of Texas.
 Before GEE, REAVLEY and HIGGINBOTHAM, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The Equal Employment Opportunity Commission challenges the policy of the University of Texas of refusing to hire for initial employment commissioned campus police officers beyond the age of forty-five. The trial court concluded that the age restriction was a bona fide occupational qualification (BFOQ) and hence legal under the Age Discrimination in Employment Act (ADEA). We affirm.
 
 I.
 
 2
 The University of Texas System consists of some fourteen institutions around the state. Under its current rules it will not consider applications of individuals seeking employment as beginning commissioned campus officers who have passed their forty-fifth birthdays. Commissioned officers are armed and authorized to conduct criminal investigations and make arrests. The age restriction does not apply to non-commissioned officers, who are assigned to direct traffic and guard buildings and parking lots, but are not armed or authorized to make arrests. Commissioned officers, once hired, may continue to work past their forty-fifth birthdays, though older officers typically assume administrative or supervisory roles through promotion.
 
 
 3
 Frank Price was hired as a campus police officer at Arkansas State University in August of 1973. In 1975, at the age of forty-six, he applied for an announced campus police officer vacancy at the University of Texas Health Science Center at San Antonio. He was told that he was ineligible for the job because of his age. He filed a complaint with the Department of Labor, then responsible for enforcing the ADEA, and this suit followed, seeking an end to the university policy and back wages owed to all victims of the alleged violations. The Equal Employment Opportunity Commission (EEOC or Commission) was later substituted as the current enforcement agency.
 
 II.
 
 4
 Section 4(a) of the ADEA, 29 U.S.C. Sec. 623(a), prohibits employer discrimination on the basis of age. The Act covers employment practices of state agencies such as the one here. 29 U.S.C. Sec. 630(b); EEOC v. Wyoming, --- U.S. ----, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). The university concedes that its hiring restriction distinguishes applicants on the basis of age, but defends the policy as a BFOQ.
 
 
 5
 Section 4(f) of the ADEA, 29 U.S.C. Sec. 623(f), establishes as a statutory exception that "[i]t shall not be unlawful for an employer ... to take any action otherwise prohibited under ... this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business ...." This circuit employs a two-prong legal test in determining whether an age classification qualifies as a BFOQ: (1) the classification must be reasonably necessary to the essence of the employer's business; (2) the employer must have reasonable cause, that is, a factual basis, for believing either that all or substantially all persons within the excluded class would be unable to perform safely and efficiently the duties of the job or that it is impossible or impractical to deal with persons over the age limit on an individualized basis. Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 235-36 (5th Cir.1976).
 
 
 6
 The burden of proof is on the employer to establish the BFOQ defense. Id. at 235. On appeal, a circuit court may of course fully and freely review whether the trial court applied the correct legal test, in this instance the Tamiami test. However, as long as the court below asked the right legal questions, its findings under each prong of the Tamiami test are findings of fact and are reversible only if clearly erroneous. Id. at 226, 233, 238; EEOC v. City of St. Paul, 671 F.2d 1162, 1166 (8th Cir.1982); Smallwood v. United Air Lines, Inc., 661 F.2d 303, 305, 307 (4th Cir.1981), cert. denied, 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); Fed.R.Civ.P. 52(a). Cf. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). In this case, the trial court made express reference to Tamiami in concluding that the defendant had established its age qualification as a BFOQ. The court also made numerous findings of fact which fall neatly within each prong of the Tamiami test. Reviewing these findings under the clearly erroneous standard, we find ample and respectable evidence presented by both sides in the record, but cannot say that any finding "is so against the great preponderance of the credible testimony that it does not reflect the truth of the case," Merchants National Bank of Mobile v. Dredge General G.L. Gillespie, 663 F.2d 1338, 1341 (5th Cir.1981), cert. dismissed, 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982), or that we are "left with the definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).
 
 
 7
 At trial, both the EEOC and the state elicited testimony from experienced and intelligent witnesses concerning the duties of campus police officers and the effects of aging on the ability of individuals to perform those duties. The EEOC presented testimony that older officers can handle the job as well or better than their younger counterparts, and that the duties of campus police officers are not as strenuous as those of other police jobs where even stricter age requirements are imposed. The EEOC also offered evidence that individualized testing of older applicants to determine job fitness is both medically feasible and financially practical. The state presented evidence, less voluminous but in our view no less credible, that older officers are less adept at handling the duties of a campus patrolman, and that medical testing cannot accurately screen applicants on an individualized basis. A theme of the defendant throughout the trial was that the duties of campus police officers are the same or similar to those of other law enforcement officers who work for employers that impose considerably lower hiring ceilings. The testimony on both sides ranged from anecdotal accounts by campus officers to technical opinions by doctors specializing in geriatrics and gerontology. Rather than summarize here all of the evidence presented, we concentrate on the evidence as it relates to the arguments raised on appeal.
 
 III.
 
 8
 The Commission argues that the age requirement is not reasonably necessary to the essence of the job, as required by the first prong of Tamiami. The district court found, and there appears to be no dispute, that "[t]he business of the University Police Department is the protection of students, staff, faculty and public safety of all persons on or near the campuses of the University of Texas System. This job involves preserving the peace, effecting arrests and suppressing crime." In concluding that the defendant had established a BFOQ, the court found "based upon the testimony of Carl Page, M.D., of Lubbock, Texas, that there is a deterioration both physiologically and psychologically which is contributable to the process of aging," and that "age statistically proved to be a prominent factor in one's individual physical condition." The court further found that "[t]he public safety of all persons on or near campus of the University of Texas System could be endangered to some degree by hiring persons as beginning peace officers if they were not commissioned prior to their forty-fifth birthday," and that "[t]he health of an average individual, 45 years or older, could be endangered in the performance of the duties of being a newly commissioned peace officer within the University of Texas police system."
 
 
 9
 We agree with the Commission that general evidence on the truism that all people deteriorate physically with age cannot by itself establish a BFOQ in this case. The statutory requirement is that the age qualification be "reasonably necessary to the normal operation of the particular business." 29 U.S.C. Sec. 623(f)(1) (emphasis added). See also EEOC v. City of St. Paul, 671 F.2d 1162, 1168 (8th Cir.1982) (evidence on general debilitating effects of age is insufficient to establish a BFOQ). Some showing is required that the specific age qualification chosen is reasonably necessary to the viability of the business because of particular job skills that older applicants lack. Likewise, we agree that offhanded, subjective opinions by hiring officials that older applicants cannot handle the job are not by themselves sufficient to justify age restrictions, since holding that such opinions are determinative would condone "precisely the stereotypical thinking that the ADEA was designed to prevent." Tamiami, 531 F.2d at 234. Instead, the defendant must demonstrate a specific, objective, or factual basis for its hiring qualifications based on age. With these standards in mind, we cannot say that the trial court's findings are clearly erroneous, even though the EEOC presented considerable evidence in opposition to the BFOQ defense.
 
 
 10
 On appeal as at trial, the university justifies its hiring limit on two grounds: (1) older individuals lack the acute physical and mental agility and stamina required to serve effectively as rookie campus officers; (2) younger officers are more qualified because they "relate" better to the youthful constituency encountered on college campuses.
 
 
 11
 There was consistent testimony at trial that physical strength, agility and stamina are important to the training and performance of campus policemen. George Hess, Jr., chief of police at the University of Houston, indicated on cross-examination that physical training is a very important aspect of training a police officer. Dr. Carl Page, a physician, testified that forty-five is an unwise age for an individual to start as a rookie policeman because his chances of being injured, developing joint problems, or having coronary disease or strokes would be greater than for a twenty-five or thirty-five year old policeman, and that the older officer would lack the physical stamina and prowess of a younger officer. Plaintiff's witness Donald Cannon, chief of the University of Texas Police Department at Austin, stated on redirect examination that a street officer's reliability diminishes considerably with age, and admitted on recross-examination that five of his officers under the age of forty-five had been assaulted the previous year, and that one probably would not have survived had he been an older officer. Frank Cornwall, director of police with the University of Texas System, indicated that the training and daily routine of his officers is strenuous, and Maurice Harr, chief of police at the University of Texas Medical Branch at Galveston, endorsed the hiring ceiling because the campus police job requires stamina and the ability to remain afoot for eight hours, cover an assigned beat, and perform individually. Dr. Paul Richard Jeanneret, a management consultant, industrial psychologist and former policeman, had conducted extensive personnel studies for the Houston Police Department and the Texas Department of Public Safety, both of whom have hiring ceilings of thirty-five. He testified that these age requirements were recommended and justified because supervisory skills, proficiency at pursuit driving, physical agility and marksmanship declined when troopers approached the age of forty or forty-five. In response to a hypothetical question, he testified that a hiring age of forty-five is too high if the duties and physical and psychological stress imposed on a campus policeman are the same as those imposed on an officer with the Department of Public Safety or a city police force. Numerous witnesses testified that the job of campus policeman is similar to that of a city policeman, and that campus police officers conduct joint operations with city officers. Several officers testified that the campus job is if anything more difficult and stressful, because of crowd control problems, the need to exercise restraint with students in a college setting, and the special problems confronted by university medical schools in treating mental patients and inmates. Evidence was presented that the maximum hiring age for policemen was twenty-nine for the city of El Paso and thirty-five for the cities of Austin, Houston and for the United States Marshal's Office, Border Patrol, Drug Enforcement Administration and the FBI.
 
 
 12
 The state also relied on testimony that younger officers are needed to understand and relate to potential offenders and to prevent minor occurrences from erupting into major ones. Chief Cannon stated that commissioned officers must take sixty hours of college credit to acquaint themselves with student pressures and problems. Mr. Cornwall stated that younger officers are better able to handle frequent confrontational episodes on campus because of their ability to relate to youthful offenders. The EEOC argues that the alleged inability of older officers to relate to college students does not justify the age qualification because it is not reasonably necessary to the essence of the employer's business, as required under the first prong of the Tamiami test. The Commission relies on Diaz v. Pan American World Airways, Inc., 442 F.2d 385 (5th Cir), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), a sex discrimination case. There we held that an airline could not justify hiring only female flight attendants on grounds that females better served the "psychological needs" of passengers and were overwhelmingly preferred by them, since these non-mechanical functions were tangential to the essential and primary function of providing safe transportation. In the present case, assuming that the trial court relied on the evidence concerning the ability of younger officers to relate to students, Diaz is clearly distinguishable. Here the asserted ability of younger officers is in no way tangential to their primary task of insuring the safety and protection of the campus community and preserving order.
 
 
 13
 The Commission asserts that the hiring ceiling was arbitrarily chosen for reasons having nothing to do with ability to perform the job. It points to testimony of Mr. Cornwall that the ceiling was raised from age forty-one to forty-five because the university was having difficulty filling certain posts, and hoped to attract persons retiring from city police forces and the military. This argument incorrectly suggests that the ability of individuals to perform effectively can never be balanced against the need to fill vacancies. The overall effectiveness of any police force obviously depends on both the quality and number of its individual members. Furthermore, raising the ceiling from forty-one to forty-five for the purpose of filling vacancies suggests, if anything, that the ceiling is too high as a measure of individual fitness for the job, and the record is clear that the new ceiling was not arbitrarily picked out of a hat, but was chosen after extensive conferences, discussions and studies of relevant police journals by the campus police chiefs. Moreover, we are extremely indisposed to read an intent requirement into the Tamiami test. While the wording of previous cases can be read in different ways, we think it wiser to interpret the test as requiring the defendant to demonstrate at trial, with objective evidence, that the age qualification is justified, rather than looking to the subjective motivation originally behind the qualification. Motivation or intent analysis plays a role in some discrimination cases. See, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66, 72-73 (1982) (challenge to seniority system under Title VII requires showing of intent to discriminate racially); Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597, 607 (1976) (constitutional challenge to hiring examination requires showing of racially discriminatory purpose). Typically, intent requirements disfavor plaintiffs because they are extraordinarily hard to meet; proving up the collective intent of a giant state institution as we have here is particularly difficult and uncertain. We therefore interpret Tamiami's requirements for an age BFOQ as not inviting judicial safaris into the overgrowth of human motivation and intent.
 
 IV.
 
 14
 Under the second prong of Tamiami, the defendant must demonstrate either that all or substantially all applicants over age forty-five are unable to perform safely and efficiently the duties of the job, or that it is impossible or impractical to deal with persons over forty-five on an individualized basis. Evidence presented at trial supports each alternative.
 
 
 15
 The Commission maintains that the university system's policy of allowing officers hired before their forty-fifth birthday to work beyond age forty-five is proof that at least some older officers can handle the job. The fact that previously hired employees are allowed to work past the initial hiring age does not by itself defeat a BFOQ. In Tamiami, such a condition did not compel this court to reverse the district court's upholding of a BFOQ. Indeed, the district court in that case upheld a hiring ceiling of forty for bus drivers even though it also found that statistically the safest driver was one between ages fifty and fifty-six with sixteen to twenty years experience. 531 F.2d at 233-34, 238 n. 32. Were we to accept the Commission's argument, the hiring ceiling would always have to coincide with the mandatory retirement age for any particular job. The university's position is that the demands of a rookie officer are physically greater than those of officers with seniority.
 
 
 16
 The trial court found: "The University System employs individuals prior to their forty-fifth birthday, however, substantially, all of the officers over the age of forty-five years of age do administrative work in contrast to the more strenuous work of patrol, because they have by virtue of their seniority achieved the rank of sergeant, lieutenant or higher." The testimony indicated that due to high turnover, patrolmen can generally expect to be promoted to sergeant in three to four years. Sergeants and lieutenants are considered supervisors, who direct the activities of the patrolmen or street officers. Chief Bratton testified that none of his patrolmen were over the age of forty-five at the Health Science Center at San Antonio. Chief Cannon testified that at the Austin campus, about twelve officers were over age forty-five, but only five of those were patrolmen. He stated that these five were treated differently from the average patrolman. Three were assigned to building duty "which requires that they not be involved in confronting crowd situations or drugs and things of that nature," and the other two were waiting for a building position to open. The state argues, we think correctly, that while the latter officers are pursuing the same job as a rookie, they are not themselves rookies. The fact that two patrolmen, experienced and familiar with the campus and its inhabitants, are over age forty-five does not convince us that the state failed to demonstrate that all or substantially all applicants over forty-five would be unable to perform safely and efficiently as rookie patrolmen.
 
 
 17
 The state also endeavored to demonstrate that it is impossible or impractical to screen applicants on an individualized basis. The litigants presented distinguished experts with radically different views. The trial court chose to believe the defendant's experts. The court found "based upon the testimony of Carl Page, M.D., of Lubbock, Texas, that medical science has not yet been able to separate accurately chronological from functional age," and "based upon the testimony of Richard Jeanerett [sic], Ph.D., of Houston, Texas and Dr. Carl Page of Lubbock, Texas, that objective testing of individuals for physical and psychological abilities to perform the work of a commissioned peace officer is difficult and seriously uncertain." Again, based on our review of the record, these findings were the subject of dispute at trial but are not clearly erroneous.
 
 
 18
 AFFIRMED.
 
 
 19
 PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:
 
 
 20
 I concur and write separately only to state candidly that our cases seem to be driven by at least three virtually sub rosa forces that make the requirements for proof of a bona fide occupational qualification under ADEA, while analogous in approach, not as exacting as those of Title VII. The first is inherent in the fact that race, sex, and national origin describe an immutable status while age is a dynamic progression. Second and relatedly is the reality that we accept the factual and legal validity of using age as a prediction of certain physical and agility skills, the inquiry being largely the correspondence between the specific age and the specific skill requirement, and we accept that age does so in such a sufficiently efficient manner that its use is not necessarily suspect. Finally, the risk of error when public safety is proved to be actually implicated is resolved in favor of safety. All of these circumstances are present here and are sufficient for me to join in affirming an otherwise close case.