654 F.Supp. 1168 (1987)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
The STATE OF MISSISSIPPI, and the Mississippi Department of Wildlife Conservation, Defendants.
Civ. A. No. J85-0669(B).
United States District Court, S.D. Mississippi, Jackson Division.
February 27, 1987.
*1169 Jerome C. Rose, Mildred Byrd, G. William Davenport and Brenda Montgomery, EEOC, Birmingham, Ala., Karen H. Baker, EEOC, Washington, D.C., for plaintiff.
John T. Kitchens and Richard D. Mitchell, Atty. General's Office, Jackson, Miss., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
BARBOUR, District Judge.
The trial of this case was bifurcated so that the Court would hear the liability issues and later, if the Plaintiffs were successful, consider the issues of reinstatement and back pay. After hearing the evidence pertaining to the liability issues, the Court announced a decision for the Plaintiff but took the case under advisement for rendition of written findings of fact and conclusions of law. Since that time, the parties have reached agreement concerning back pay computation. The Court hereby enters its findings of fact and conclusions of law.

FINDINGS OF FACT

I. Background

A. The Parties

1. Plaintiff Equal Employment Opportunity Commission (EEOC) is a federal agency charged with the administration, interpretation and enforcement of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (ADEA).
2. Plaintiff is expressly authorized to bring this action under Section 7(b) of the ADEA, 29 U.S.C. § 626(b), and by Section 2 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781 as ratified by Public Law 98-532, effective October 19, 1984.
3. Defendants State of Mississippi (State) and Mississippi Department of Wildlife Conservation (Department) are employers within the meaning of Section 11(b) of the ADEA, 29 U.S.C. § 630(b) (Stip. 3).
4. The Department of Wildlife Conservation is an agency of the State of Mississippi devoted to the management and conservation of natural wildlife resources in the State. It is divided into two Bureaus, Fisheries and Wildlife and Marine Resources. The former is charged with enforcement of state laws governing hunting, fishing, boating, cattle theft and litter, conservation activities through community education, maintenance of game management areas, ongoing wildlife studies and other activities, maintenance of recreational lake areas and education of the public in hunter safety and boat and water safety. The latter is primarily charged with regulation of salt water fishing and Mississippi's shell-fish industry (Stips. 4, 5).
5. Two issues are presented in this case. The first is whether the Defendants' adoption in 1985 of an age 60 mandatory retirement policy (phased in as age 62 on July 1, 1985, and reduced to age 60 on July 1, *1170 1986) for conservation officers within the Bureau of Fisheries and Wildlife is violative of Section 4(a) of the ADEA, 29 U.S.C. § 623(a). Prior to the adoption of the new policy normal retirement age for the Department was 65, although employees could, under certain circumstances, work to age 70 before and after the Supreme Court's decision in EEOC v. Wyoming, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) applying the ADEA to the states (Stip. 17; Exh. P-4c).
6. The second issue is whether the Defendants' adoption in 1985 of 35 as the maximum age at which conservation officers in the Bureau of Fisheries and Wildlife would be hired is violative of the ADEA. In 1983, and prior to the adoption of the new policy, the Department had no maximum hiring age in effect.

B. Origin of this Suit

7. On May 22, 1985, conservation officers Kenneth Ross and Wilbur Hanks filed charges with the EEOC, alleging discrimination under the ADEA, in that the Department had given them notice on April 19, 1985, that pursuant to the strictures of Senate Bill 2319, legislation passed and signed in the spring of 1985, they and all conservation officers in the Bureau of Fisheries and Wildlife over the age of 62 would be mandatorily retired as of July 1, 1985. On June 25, 1985, another conservation officer affected by the new mandatory retirement law, Robert Stroud, also filed a charge with the EEOC (Stip. 20).
8. On July 1, 1985, the EEOC, in seeking temporary relief for these charging parties, filed its complaint alleging that Defendants had violated Section 4(a) of the ADEA, 29 U.S.C. § 623(a), by involuntarily retiring conservation officers in the Bureau of Fisheries and Wildlife who attained age 62 (age 60 as of July 1, 1986) (Stip. 21).
9. Plaintiff's request for an order temporarily restraining Defendants from retiring conservation officers who had attained the age of 62 was heard and denied on July 1, 1985. (Stip. 22).
10. On November 25, 1985, the EEOC issued to Defendants a Letter of Violation, notifying Defendants that the provision of Senate Bill 2319 setting age 35 as the maximum age at which a conservation officer in the Bureau of Fisheries and Wildlife could be hired was a violation of Section 4(a) of the ADEA, 29 U.S.C. § 623(a) (Stip. 17).
11. Plaintiff moved, on January 30, 1986, for leave to amend its complaint to add the claim that an additional provision of Senate Bill 2319 limiting those persons who could be hired as Fish and Wildlife conservation officers to those who had not yet attained their thirty-sixth birthday, was violative of the ADEA, Section 4(a), 29 U.S.C. § 623(a). That motion was granted and the amended complaint was duly filed (Stip. 29).
12. On July 25, 1986, Nolan Martin filed a charge with the EEOC claiming that he was being discriminated against on the basis of his age in that he desired to obtain a position as a conservation officer in the Department, but at age 42 was over the maximum age allowed for hire into the job (Stip. 30).
13. Attempts to conciliate with Defendants on the allegations by the EEOC and charging parties were unsuccessful (Stips. 26, 28).
14. On October 17, 1986, the United States Congress amended the ADEA (ADEA Amendments of 1986). While prohibiting the use of any mandatory retirement, the amendments provide, inter alia, that as of January 1, 1987, states may reinstate any age restrictions for law enforcement and firefighter personnel that were in effect on March 3, 1983, for a seven-year period. During this period, the EEOC is directed, in conjunction with the Department of Labor and relevant outside interest groups, to produce a study and regulations on means to assess the fitness of such personnel, without resort to age restrictions. Given the timing of trial of this case, December 2, 1986, the issues in this case were reduced to whether Defendants can carry their burden of proving that mandatory retirement at age 60, instead of *1171 age 65, and that a maximum hiring age of 35 are reasonably necessary to the essence of the business of the Department (Exh. p-68).

C. Origin of the 1985 Age Restrictions

15. Prior to March 3, 1983, all personnel within the Department, including conservation officers and others with law enforcement responsibility (See findings 40-45, infra) were subject to a usual retirement age of 65, but could continue working until age 70 dependent on yearly extensions if granted by the Department. After the Court's decision in EEOC v. State of Wyoming, supra, the State Personnel Board began planning work on a study of mandatory retirement.
16. The Mississippi State Personnel Board commissioned a study on mandatory retirement for scale operators hired by the Mississippi State Tax Commission. The firm of industrial psychologists, Morris and McDaniel of Jackson, Mississippi, was retained to perform this study. Toward the close of that study it became apparent that the cost of that study would be less than the amount of the appropriation for it, and the State Personnel Board suggested that the Department of Wildlife Conservation undergo a similar mandatory retirement age study, using the left-over funds. It was also thought that the same research could be used for the second study. However, there was not enough money to pay for a study of the entire department so the Bureau of Wildlife and Fisheries was selected for study and further only Conservation Officers within that bureau were selected. It is clear that the Department officials did not request the study but merely acquiesced in it.
17. The study performed by Morris and McDaniel involved the interview of seven conservation officers, two in the Bureau of Marine Resources, and five in the Bureau of Fisheries and Wildlife. Six of the seven were each interviewed by one person, who was either employed by the firm of Morris and McDaniel, or by the State Personnel Board. The seventh, Freddie Overby, was interviewed by three persons in two different interviews (Exh. P-26).
18. The interviews lasted 1.5 to 3 hours, and the total time spent on the interviews is unclear. No notes on the process were retained by the firm (Exh. P-26).
19. After these interviews, task statements were written to reflect the tasks performed by officers. Then in a series of meetings, other officers were asked to assess whether they performed the tasks, how often they performed the tasks, whether performance was necessary on entry onto the job, and whether performance in the tasks separated the better officers from the less talented (Exh. P-26).
20. Drs. Morris and McDaniel then determined that the "critical tasks" in the job of conservation officers were pursuit driving and dealing with hostile and aggressive individuals who are sometimes armed (Exh. D-15).
21. Drs. Morris and McDaniel then took the tasks determined to be critical and matched them with literature on laboratory experiments that they determined tested elements that comprised the tasks. For example, driving performance may be affected by reaction time; laboratory experiments on reaction time were examined in the study. The experiments examined had been performed generally 20-30 years ago and typically compared twenty-year olds to older groups including persons from their sixties to their nineties (Exh. D-15, P-27).
22. Drs. Morris and McDaniel then determined that because their studies on performance on laboratory tasks by younger and older experimental subjects often showed differences between the groups, conservation officers within the Bureau of Fisheries and Wildlife who were over 60, and new hires over the age of 35, could not effectively perform the critical tasks.
23. The tasks identified by Drs. Morris and McDaniel as critical for conservation officers in the Bureau of Fisheries and Wildlife are the same tasks as they had identified in an earlier study as critical for Mississippi State Tax Commission scales *1172 operators. The study performed on conservation officers utilized the identical research as had been utilized in the Tax Commission scales operator studies, and determined that both jobs demanded a mandatory retirement age of 60.
24. Drs. Morris and McDaniel did not examine the actual performance of any conservation officers aged 60 or more or any officer who had been hired after age 35. There were significant numbers of both available to study (Exh. P-9; P-26).
25. The report that resulted from the Study performed by the firm of Morris and McDaniel was used to support proposed legislation, Sen. Bill 2319, that had been introduced before the Mississippi Legislature in January of 1985.
26. In February, 1985, the Mississippi Legislature passed, and in April, 1985, the governor of Mississippi signed into law Senate Bill 2319, which, inter alia, provided for the amendment of Section 49-1-15 of the Mississippi Code of 1972, as amended, to implement the following policies only within the Bureau of Fisheries and Wildlife, Department of Wildlife Conservation:
a. As of July 1, 1985, all conservation officers upon attainment of age 62 would be mandatorily retired; and
b. As of July 1, 1986, all conservation officers upon attainment of age 60 would be mandatorily retired; and
c. As of July 1, 1985, no individual who had attained his 36th birthday would be eligible for the position of conservation officer.
(Stip. 19).
27. No legislative history on this enactment exits, as is usual in the Mississippi Legislature. Former Department Director Lon Strong stated that the Department was aware of the bill only after it was introduced, and that he was not consulted as to whether there were any problems with older officers. Ms. Mary Lawrence Gervin of the State Personnel Board spoke in favor of the bill, "simply reiterating the conclusions in the study." She confirmed that no information on actual problems with older officers had been elicited; she also noted that legislators were not allowed to obtain copies of the Morris and McDaniel study before voting on the bill.
28. The mandatory retirement age for conservation officers was sold to the legislature without request by the Department of Wildlife Conservation, without first instituting health and fitness policies within the Department, without proper research and study and largely on the basis of promotion by the firm of industrial psychologists.
29. The following individuals were retired by the Department between July 1, 1985, and June 30, 1986, solely on account of their having reached the age of 62, in compliance with Senate Bill 2319:
 Claude Brown (age 62)
 Gentry Dowland (65)
 J. Wilbur Hanks (62)
 Hubert McFarland (65)
 Robert McNeece (62)
 Kenneth Ross (63)
 Robert Stroud (63)
(Stip. 23).
30. The following conservation officers were retired on July 1, 1986, solely on account of their having reached the age of 60 by that date, in compliance with Senate Bill 2319:
 Charles L. Barkley
 William R. Perkins
 J.W. Renfrow
 Herndon Richardson
 Cecil B. Shoemake
 T.C. Walker
 Doris Weaver
(Stip. 24).
31. Before July 1, 1987, two more conservation officers will be retired solely on account of their having reached the age of 60, including Curtis N. Tircuit and Patrick P. Toomey. (Stip. 15; Exh. P-9).

II. Defendant's Contentions in Support of its Post-1983 Age Restrictions

32. Defendants have presented several bases for their contention that maintenance of an age 60 mandatory retirement and a *1173 maximum hiring age of 35 are reasonably necessary to performance of the job of conservation officer within the Bureau of Fisheries and Wildlife, and that there is no less discriminatory means available to determine whether individuals are able to continue to work as conservation officers, because testing is unavailable and all or nearly all conservation officers above the stated ages are unable to do the job.
33. Defendants' first contentions go to the ability of trainees over 35 to learn and officers over 60 to continue to function in the "critical tasks" of the job of conservation officer. In this regard, Defendants rely principally on the study by Drs. Morris and McDaniel (Exh. D-15).
34. Defendants also offered the opinions of three other expert witnesses, Drs. Paige, Petrini and Crosthwait. Dr. Paige is a general practitioner M.D. from Lubbock, Texas, with experience in geriatric practice. Dr. Petrini is an exercise physiologist with the University of Mississippi system. Dr. Crosthwait is a cardiologist from Jackson, Mississippi.
35. Dr. Paige testified generally that as people age they decline, and it is in their best interest to retire from active occupations. Dr. Paige also testified that there are always exceptions to the rule that people decline with age, especially for people who have been very active. The more physical, the healthier he is. Dr. Petrini testified that aerobic capacity declines with age, and older officers would be less likely to have a certain aerobic capacity. Dr. Crosthwait testified that heart disease may be difficult to detect, and that as a physician he would not want his older patients to perform the job of conservation officer.
36. The Department also offered the conclusions of its management that the new age restrictions were necessary to ensure an effective force.

III. The EEOC's Response

37. The EEOC countered the Department's argument with a variety of information on the actual practices of the Department and the testimony of expert witnesses on the process of aging and incidence of disease.

A. Operation of the Department of Wildlife Conservation

38. The Department is divided into two Bureaus, Fisheries and Wildlife and Marine Resources. Fisheries and Wildlife activities are generally confined to fresh-water fishing matters and hunting; Marine Resources is primarily charged with enforcement of state law on salt water fishing and regulation of Mississippi's shellfish industry. In February, 1986, there were 152 conservation officers in Fisheries and Wildlife and 22 in Marine Resources (Stip. 5).
39. Within the Bureau of Fisheries and Wildlife there are three Divisions: Law Enforcement, Fisheries, and Game. The conservation officer positions at issue in this lawsuit are found in the Law Enforcement Division (Stip. 6).
40. There are personnel called Area Managers who work in the Game Division. Area managers live on their assigned game management area, performing assorted tasks that include farming ground cover to feed wildlife in winter months. They generally are expected to function as conservation officers during the hunting season months, both on the tract of land they manage and directly with the conservation officers in their county. In February, 1986, there were 36 Area Managers (Stip. 7; Exh. P-14).
41. There are personnel called Lake Managers who work in the Fisheries Division. Lake Managers live adjacent to the lake they manage, and perform assorted tasks that include managing the camping areas and public beaches on state-owned lake property in the summer months. They are generally expected to function as conservation officers during the hunting season months, working directly with the conservation officers in their county. In February, 1986, there were 19 Lake Managers (Stip. 8; Exh. P-15).
42. The counties in Mississippi, and therefore the conservation officers working *1174 within them, are currently divided by the Department into six districts for administrative purposes. Each district is headed by a District Manager, who may or may not perform the same law enforcement activities as do the conservation officers. Under each District Manager there are two or three supervisors, each with approximately six to 10 officers under his supervision. In February, 1986, there were 17 supervisors (Stip. 15).
43. Conservation officer supervisors in Fisheries and Wildlife have responsibilities that include, in addition to performing the same law enforcement duties as conservation officers some of the time, organizing details of officers for complex law enforcement projects, such as apprehending night hunters or checking substantial numbers of persons fishing at a state lake property; performing paperwork on expenditures; compiling statistics on arrests; and rating officers' work and filling out performance appraisals. (Stip. 14).
44. Fisheries and Wildlife also employs hunter safety supervisors, and special investigators who perform a variety of law enforcement activities. During hunting season hunter safety supervisors perform the same hunting enforcement activities as do conservation officers, area and lake managers, and supervisors. In February, 1986, there were six hunter safety supervisors and four special investigators (Stip. 16).
45. Conservation officers, supervisors, area and lake managers, and hunter safety supervisors all engage in the most dangerous law enforcement activities in the Department, those identified by Drs. Morris and McDaniel as "critical tasks," including apprehension of night hunters and vehicle pursuit. Virtually all firearms assaults on officers have occurred in night hunting situations (Exh. P-9; Exh. P-12 through P-15).
46. Conservation officers do not have full police powers. They are limited to exercising arrest powers pursuant to violations of fish and game laws, cattle theft and littering. Area and lake managers and conservation officers in the Division of Law Enforcement exercise the same arrest powers.
47. The only Department law enforcement officer killed in the line of duty in the past ten years was a lake manager (Stip. 35).
48. Area and lake managers, supervisors in the Bureau of Fisheries and Wildlife, and conservation officers in the Bureau of Marine Resources, all retire, by state law, at age 70. Only Bureau of Fisheries and Wildlife conservation officers, of all the Department of Wildlife Conservation personnel who perform law enforcement activities, must retire at age 60 (Stips. 33, 37).
49. The requirements for hire as a conservation officer in the Bureau of Fisheries and Wildlife include the following: being over 21 and under 36, passing a written test and passing a background check on character, and having one's family physician certify him qualified to attend the Mississippi Law Enforcement Training Academy (Exh. D-6).
50. No standards are presented to the family physician to guide him in his determination that the candidate is healthy. In recent years, newly hired conservation officers certified for the academy by their family physicians have included individuals with bad backs, bad knees, and at least one who was grossly overweight. The Department performs no physical screening of its own.
51. All newly hired conservation officers and area and lake managers in the Department must attend the Mississippi Law Enforcement Training Academy (MLETA) basic classes and be certified as to law enforcement officers under the State's Minimum Standards (Stip. 37).
52. The Mississippi Law Enforcement Training Academy curriculum includes classroom work, physical fitness and combat training, officer survival training and pursuit driving instruction. A minimum average grade of 70 on academics and expert *1175 marksmanship is required for graduation.
53. Despite physical training, officers do not have to meet any physical standards to graduate from MLETA. Scores are kept on a variety of physical tests, including a mile run, performing five push-ups, five chinnings and 20 sit-ups, and physical self-defense. However, failure to meet the 70% overall minimum for these physical tests does not result in failure to graduate from MLETA, nor does this failure preclude serving as a conservation officer.
54. Officer survival training is also taught, entailing control of stress reactions in dangerous situations. Passing scores on this segment are not required. Departmental records show that a conservation officer hired in April of 1985 at the age of 26 failed officer survival training at MLETA, and thereafter has continued with the Department as a conservation officer (Exh. P-24).
55. Defensive driving tactics are taught to support pursuit driving activities. There is no requirement that a recruit pass the course, however, to be certified as a law enforcement officer. The training officer at MLETA, Charles Alexander, stated that law enforcement officers of all ages have had trouble driving through the pylons because of their slow reflexes (MLETA does not have a maximum age at which recruits will be accepted and persons of all ages have come through it).
56. The only standards for retention of supervisors, lake and area managers, and conservation officers in Fisheries and Wildlife include (1) the same yearly qualification standards for the use of firearms, (2) not committing criminal acts, and (3) performing adequately according to the standards set out in the performance review forms. There are no physical fitness or health standards.
57. The yearly firearms qualification tests officers' information processing and reaction time. One aspect of the test is a "night stress course." Several different colors of targets are hidden over the course; just before beginning, the officer is told which colors are the target  hitting any of another color lowers the score. The officer begins the course by leaving his truck and shooting over the head, then sprinting to a sheltered spot, shooting as the targets rise up (the targets also disappear quickly, so quick decision-making and action are essential), then quickly crawling through a culvert and rising to shoot on the other side. Another sprint ends in a building, with doors to open, and targets and non-targets fleetingly displayed in half-light. The officer must accurately and quickly shoot the correct targets in each situation presented. Officers are also required to successfully complete traditional target shooting courses.
58. The night stress course is a particularly important test of conservation officers' ability and judgment because armed resistance is most likely to occur at night. Approaching night hunters on foot is the most dangerous activity of conservation officers.
59. Only about half the officers score the 80% which is required to pass the night stress course. Some of the younger officers do not pass, while some of the officers over 60 have routinely passed.
60. Passing the night stress course is not required to continue to serve as a conservation officer.
62. Since yearly firearms qualification became mandatory in 1984, only one conservation officer, supervisor, or lake or area manager has failed to pass the firearms qualification test. The individual, a conservation officer in the Bureau of Fisheries and Wildlife 57 years old at the time, had never passed the firearms qualification, due to a nervous condition, since the time he was hired some 20 years earlier (Stip. 39).
63. The Department has had, at least since 1983, a complex performance evaluation mechanism in place. Each officer is rated each year. During the course of the year, warnings are given for substandard performance (Exh. P-7b, P-12 through 15).
*1176 64. The Department collects information monthly on each officer's arrests and assists in arrests (Exh. D-16).
65. The Department also collects and evaluates complaints from the public on performance, and may become aware of substandard performance. In the case of one officer who died of acute alcoholism in his forties, there had been public complaints about his being intoxicated on the job for years prior to his death (Exh. P-7b, P-9, P-24).
66. The Department does not require continued good health for conservation officers, supervisors, lake or area managers. The Department has a practice of retaining on active duty officers with such conditions as heart disease, bad back and knees, diabetes, alcoholism, and obesity. Officers ranging from their twenties to their sixties have had these conditions (Exh. P-24).
67. A high level of physical fitness is not required by the Department. There are conservation officers who are grossly overweight and could never run who are nevertheless excellent officers, according to former Chief of Law Enforcement, Phillip Strong. There are no physical standards for incumbents.
68. Freedom from heart disease is also not a qualification for performing the potentially dangerous tasks of law enforcement officers. Individuals in their forties and fifties with known heart disease have been successful in the job of conservation officer; more than one officer or supervisor has continued active law enforcement work after heart attack, heart surgery, or both (Exh. P-24, P-9).
69. The Department makes no effort to monitor an employee's heart attack risk factors. The Department conducts no testing for signs of heart disease, which would include screening employees for high blood pressure, high cholesterol, diabetes, or other factors that may greatly increase the risk of heart attack (Exh. D-13, P-24).
70. The Department does not require that an employee returning from illness or injury undergo any physical examination, but merely requires that the employee submit a note from his doctor that he is able to return to work.
71. One conservation officer died of a heart attack while involved in pursuit of violators in an incident 10 years ago. The conservation officer, who was 44 years old, was pursuing night hunters by truck. At the onset of the attack, the officer pulled over to the side of the road and stopped the truck. The attack was fatal, but no member of the public was injured.
72. Another conservation officer died of a heart attack in April, 1985. The 49 year old officer walked out of his home on his way to a normal morning of patrolling. After getting into his truck, he got back out, returned to the house and died minutes later.
73. One area manager died of a heart attack several years ago while walking across a field during his by-yearly Departmental training. He was 59 years old; he had had a prior heart attack.
74. No conservation officer over the age of 60 has had a heart attack on the job or died of a heart attack in the period at issue here, 1981-85.
75. Several Department employees were shot on the job during Chief Strong's tenure (1976-1986). These employees ranged in age from their 30's to 60's. Chief Strong stressed that none of them could have prevented the shooting by any physical act  the shootings were essentially ambush situations, with no warning given to the officer, and no opportunity to either run or wrest away a weapon.
76. Training and management personnel within the Department agree that the most important attribute for successful performance of the conservation officer's job is good judgment.
77. All information available indicates that officers over 60 years old were, as a group, performing adequately in all phases of conservation work (Exh. P-9).
78. Former Chief of Law Enforcement Phillip Strong stated that he knew which of *1177 his officers were and which were not performing their jobs properly.
79. Chief Strong stated that conservation officer Kenneth Ross, who was mandatorily retired on July 1, 1985, was among the best officers on the force. Ross received the award given by the Department for Conservation Officer of the Year for 1984 when he was 62 years old.
80. The former Training Coordinator for the Department, Johnny Laney, indicated that Curtis Tircuit, who will be retired mandatorily in September, 1987, is one of the best conservation officers on the force. Mr. Laney also judged Kenneth Ross to be one of the state's best officers at the time of Ross' forced retirement.
81. The majority of the officers who have been mandatorily retired, or will be in 1987, have functioned effectively right up to the day of retirement (Exh. P-9).
82. Those mandatorily-retired officers that were not functioning as efficiently as others had long-standing health problems which impaired performance. Both the problems and the impairments had been known to the Department for many years. (Exh. P-24).
83. There is no indication that individuals hired after the age of 35 have been less effective as conservation officers than individuals hired before the age of 35. (Exh. P-9).
84. The former Chief, when questioned about his support for institution of age 35 maximum hiring, stated that he did not know anything about that issue. Former Executive Director Lon Strong stated that the new hiring restriction would make the Department "more efficient."
85. The Defendants assert a necessity for health and physical fitness in four basic areas: strength, running, reaction time and cardio-vascular. Defendants assert their conservation officers need strength to pull boats out of rivers, to lift nets into boats and to drag deer carcasses out of the woods. There is no proof that officers over age 60 are unable to perform these tasks, but, if there were, simple tests could be devised at a minimum cost. Defendants assert that conservation officers are called upon to run in order to capture offenders. On the surface this would appear to be true. However, even young officers able to run quickly learn that most fleeing offenders are not caught on foot and that they can be apprehended easier in other ways. If, however, running ability is perceived by the Department to be a necessary qualification, simple speed and endurance tests can be required at practically no expense. The Defendants argue that reaction time declines with age and that quick reaction is necessary in dangerous situations such as night hunting arrests and high speed chases. The proof shows that these situations are relatively rare and that the decline in reaction times between ages 60 and 65 are inconsequential. Again, however, if the Department wishes to specify ability to react within testable ranges, the technology is available at relatively low cost. Also, the State has a driving course which is used to train its law enforcement officers, including conservation officers, in the skills of high speed pursuit. This course could easily be used to test reaction time at specified levels. The Defendants also assert a need for cardio-vascular fitness allegedly for public safety. The Defendants do not terminate conservation officers with known cardio-vascular disease. The proof shows there is only an infinitesimal chance of a cardio-vascular incident suffered by a conservation officer occurring at a time when public safety might be at issue. There is no proof that there is a greater incidence of cardio-vascular disease among conservation officers who are 60 to 65 years of age than those who are younger. If the Department wishes to institute a policy of cardio-vascular fitness, maximum weight for height standards could be instituted and annual blood pressure and blood cholesterol levels could be tested at relatively low cost.

B. Other States' Practices

86. The EEOC also showed that the majority of states do not find it necessary to retire their conservation officers as early *1178 as does Mississippi, with most retiring officers at 65 or 70. The National Park Service, whose law enforcement officers must perform such activities as the apprehension of perpetrators of violent crime and the rescue of injured hikers in dangerous terrain and weather conditions, does not have any mandatory retirement age (Exh. P-5a, P-5b, P-6).
87. Almost no states have maximum hiring ages in effect for conservation officers. Further, the National Park Service routinely hires individuals who have completed 20-year military careers (Exh. P-5a, P-5b, P-6).

C. The EEOC's Experts' Testimony

88. The EEOC's experts included two psychologists (one with a background in industrial psychology, the other in gerontology), a cardiologist, an exercise physiologist, and a statistician.
89. The EEOC's statistician, Sally Dowies, introduced a data base the EEOC constructed from personnel records maintained by the Department. The data base included basic demographic data and job history data on all officers, supervisors, area and lake managers and district managers in the Bureau of Fisheries and Wildlife, plus information on various performance measures, commendations and disciplinary actions, and health data that was available from the Department. Ms. Dowies demonstrated the fact that in regard to significant measures of performance the profiles of officers over the age of 60 were very similar or equal to the profiles of younger groups of officers (Exh. P-9).
90. The EEOC's gerontologist was Dr. K. Warner Schaie, an eminent researcher in the field of aging and Director of Pennsylvania State University's Gerontology Center. Dr. Schaie, who is also a full professor of human development and psychology at Penn State, testified that aging is an individual process, and that at age 60, the variation between individuals is wide. Dr. Schaie demonstrated how the study performed by Drs. Morris and McDaniel was inadequate to establish a need for retirement of conservation officers over 60, through explanation of the deficiencies in the literature used in the study and the use of that literature given the current state of aging research. McDaniel was unprepared and unable to defend his study. Dr. Schaie provided convincing evidence that the study and its conclusions do not reflect the current state of knowledge on aging.
91. Dr. David Pryor, the EEOC's cardiologist, is an Assistant Professor of Cardiology at Duke University, and Director of Duke University Medical School's Clinical Epidemiology and Biostatistics. Dr. Pryor is experienced as a clinician, a researcher and a statistician. Dr. Pryor also acts as a consultant to various organizations on health policy, and is experienced in examining organizational practices utilizing his expertise in policy formulation, statistics, and clinical medicine. Dr. Pryor presented statistics on the incidence of heart attack and the meaning of those statistics in terms of effective retirement policies. He utilized health data from the Department to illustrate the Department's operating policies with regard to health and fitness, and discussed how health standards could be implemented.
92. Dr. Pryor demonstrated that the probability that an officer will have a heart attack while engaged in a critical task, and that that heart attack will result in danger to the public, is infinitely small, and is not a factor that justifies or should influence the imposition of a mandatory retirement policy for conservation officers. He further demonstrated that the Department does not have a qualification of good health or fitness, given the medical profile of its current employees. Finally, he discussed the efficacy of testing for heart disease, and the implication of testing.
93. Dr. Pryor concluded that if the Department's goal is an interest in employing healthy persons as conservation officers, the means to accomplish the aim are available. The new age restrictions, however, will not accomplish the aim.
94. The EEOC's expert industrial psychologist was Dr. Joel Lefkowitz, who also *1179 is a professor of industrial psychology at Bernard Baruch College, City University of New York. Dr. Lefkowitz has studied jobs in diverse fields, including law enforcement. He provided an overview of the work of conservation officers and other law enforcement personnel in the Department, utilizing the historical data on officers' performance to demonstrate that the conclusions of Drs. Morris and McDaniel were not based on the best information possible, and are not credible. Dr. Lefkowitz characterized the Morris-McDaniel study as having "an incomplete literature review, unrepresentative samples, inadequate data, being tied in an enormous inferential leap to the ability to perform a job where those psychological constructs have never been defined for the job to begin with." The Court agrees with this assessment.
95. Dr. Richard Mostardi was the EEOC's exercise physiologist. He is a professor of Biology at the University of Akron, and affiliated with Akron City Hospital, where he is Technical Director of Executive Testing and Director of In Vivo and Clinical Research. He is a consultant to the City of Akron and designs and tracks fitness testing for the Akron police department. Dr. Mostardi testified that there was no indication that officers over the age of 60, as a group, have either inadequate aerobic or muscular strength to effectively perform the job. He explained the variation in aerobic capacity among groups of individuals and how aerobic capacity affects individuals' work performance. He analyzed the aerobic capacity and muscular strength demands of the conservation officer's job, in the course of coming to his conclusion that Defendants had failed to establish a performance standard for either trait, and that Defendants had failed to establish that all or nearly all conservation officers over 60 would perform inadequately with regard to the traits. He noted that yearly testing performed by the Department since before institution of the new age requirements was a good measure of several physiological traits at issue, and no indications exist that older officers were as a group inadequate. He further demonstrated how a law enforcement agency can institute fitness testing programs that are effective and inexpensive.
96. In short, the EEOC's experts concluded that based on the actual operation of the Department, there was no standard of fitness or health for conservation officers. However, the experts agreed that even if there were a standard of performance, there was no reason to believe that all or nearly all officers who do not meet the new age restrictions would be deficient, or that testing to determine fitness for the job would not be possible.

CONCLUSIONS OF LAW
1. Plaintiff EEOC has established a prima facie case of Defendants' unlawful age discrimination under Section 4(a) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 623(a), in the Department of Wildlife Conservation's implementation of a mandatory retirement policy of 60 (62 from July 1, 1985, to June 30, 1986) and a maximum hiring age of 35 on the basis of a Mississippi law that was effective July 1, 1985, Section 49-1-15 of the Mississippi Code of 1972 as amended.
2. To prevail in their assertion that these age restrictions for conservation officers are exempt from the general coverage of the ADEA because they are "bona fide occupational qualifications (BFOQ's)" under § 623(f)(1) of the ADEA, Defendants are required to make a "particularized factual showing" as to each element of the BFOQ defense. Johnson v. Mayor of Baltimore, 472 U.S. 353, 105 S.Ct. 2717, 2722, 86 L.Ed.2d 286 (1985). Defendants must first prove that there are particular job qualifications that are reasonably necessary to the essence of the business. Western Airlines, Inc. v. Criswell, 472 U.S. 400, 105 S.Ct. 2743, 2748, 86 L.Ed.2d 321 (1985). If those qualifications are proven to be reasonably necessary, Defendants must then further prove that they are compelled to rely on age as a proxy for assessing those qualifications. Id. 105 S.Ct. at 2751. This reliance can only be allowed when Defendants demonstrate either that *1180 all or nearly all persons who do not meet the age restrictions "lack the qualifications required for the position" or that it is "highly impractical for the employer to insure by individual testing that its employees will have the necessary qualifications." Id. at 2753, 2756 (citing Usery v. Tamiami Trails Tours, Inc., 531 F.2d 224, 235-236 (5th Cir.1976)).
3. The BFOQ exception to the general strictures of the ADEA against age limitations is an extremely narrow one. Criswell, 105 S.Ct. at 2751, and evidence in support of it must be examined carefully.
4. This Court finds that the essence of the business of the Bureau of Fisheries and Wildlife within the Department of Wildlife Conservation is management and conservation of natural wildlife resources in Mississippi, through enforcement of game and fish laws, and education programs in the community, and enforcement of and education on boating and water safety laws.
5. Defendants have not provided the Court with the particular job qualifications, reasonably necessary to carry out the mission of the Department, that are to be examined under the two-pronged BFOQ analysis set out by the Supreme Court in Criswell, id. at 2752-53. Failure to provide the particular job qualifications precludes any consideration of the further essential question, which is whether age restrictions are reasonably necessary.
6. Defendants have failed to articulate and prove job qualifications for this job sufficient to continue to the second prong of this test.
7. "Off-hand, subjective opinions by hiring officials that older applicants cannot handle the job" do not establish particular qualifications for the job under the first prong of the Tamiami standard. EEOC v. University of Texas Health Science Center at San Antonio, 710 F.2d 1091, 1094 (5th Cir.1983).
8. Defendants have failed to establish that older applicants or conservation officers lack particular job skills "reasonably necessary to the viability of the business." Id. Defendants have described the job of conservation officer as strenuous, stressful, and dangerous, and have attempted to establish vague qualifications for the job, including vigor, strength, quickness, and other imprecise qualities generally thought of as youthful attributes. However, these extremely vague concepts provide no foundation for this Court to advance to the second prong of the analysis to determine whether all or nearly all officers over age 60 or applicants over 35 are unable to perform the job or whether individual assessment of qualifications is possible. See Weeks v. Southern Bell Telephone and Telegraph Co., 408 F.2d 228, 235-36 (5th Cir.1969), cited in Criswell, 105 S.Ct. at 2751 n. 19.
9. Defendants in essence assert that a "youthful" department is reasonably necessary to the operation of the Department. See Pre-trial Order in this cause at 8, 9. But "if a good-faith judgment, based on a loose fit between the needs of the job and the effects of age, were enough to bring a mandatory retirement policy within the shelter of section 623(f)(1), the Act would have little bite." Heiar v. Crawford County, 746 F.2d 1190, 1197 (7th Cir.1984).
10. The issue here is not whether having "young" officers is reasonable or rational, phrases which "convey a meaning that is significantly different from the statutory phrase `reasonably necessary'." Criswell, 105 S.Ct. at 2755. "It might be `rational' to require mandatory retirement at any age less than 70, but that result would not comply with Congress' direction that employers must justify the rationale for the age chosen." Id. at 2756. That justification demands "persuasive reasons why the employer needed to impose a mandatory retirement age on its employees." Heiar v. Crawford County, 746 F.2d at 1198.
11. Defendants have not provided persuasive reasons why they needed to impose the new age restrictions at issue here. Not only were the qualifications claimed vague, but the actual personnel practices of the Department of Wildlife Conservation provide *1181 additional evidence that no such qualifications exist in practice. This constitutes proof that the Department did not need to impose mandatory retirement age, or a maximum hiring age.
12. Most persuasive is the fact that prior to July 1, 1985, this Department had extensive and successful experience with conservation officers over the age of 60. The evidence that the officers functioned effectively is persuasive. Many ADEA BFOQ cases are decided without reference to a defendant organization's actual experience with older officers, because the organization had never or not in recent times retained individuals over the age in question. Here, the record exists. The operation of the Department without the new age restrictions does not suggest their necessity.
13. It has been established that four other job classes in the Bureau of Fisheries and Wildlife perform many tasks performed by conservation officers, including the most arduous and dangerous work in the Department, night hunting details. Area and Lake Managers do this work both in their own management areas and in cooperation with the conservation officers in their county. Supervisors also routinely actively participate in these activities. Others who may more or less often participate in the most dangerous activities include investigators, hunter safety supervisors and district managers. None of these classes of employees must retire prior to age 70; neither is the maximum hiring age of 35 applied to these positions. This practice suggests that performance of even the most difficult work of a conservation officer may be efficiently performed by persons not meeting the statutory age restrictions for conservation officers. Evidence of the age restriction practices of equivalent businesses with regard to "congruent" jobs is highly relevant in examining whether a BFOQ exists for a particular position. Criswell, 105 S.Ct. at 2756; see generally, Johnson v. Mayor and City Council of Baltimore, 472 U.S. 353, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985). Evidence of the practices of the Department with regard to the same job duties at issue is extremely probative. The evidence that this Defendant has others perform the same duties without imposition of the age restrictions leads the Court to conclude that the age restrictions are not reasonably necessary to the operation of the Department.
14. Further evidence that age 60 retirement or 35 maximum hiring ages are not reasonably necessary is that the vast majority of the states do not require retirement of conservation officers before age 65, and that the United States Park Service has no retirement or maximum hiring age for its commissioned law enforcement officers.
15. An employer of law enforcement personnel who wishes to establish good health and physical strength as qualifications for law enforcement jobs may not ask the Court to presume the reasonable necessity of employing only individuals in top physical condition, but must have factual support for the proposition. EEOC v. Commonwealth of Pennsylvania, 768 F.2d 514, 518 (3rd Cir.1985). The Department has hired and retained individuals with serious medical problems or physical inadequacies sufficient to affect job performance significantly. This information suggests that continued good health is not a qualification for the job.
16. Further, the Department undertakes no monitoring of the health of its law enforcement population. No annual, five-year or even twenty-year check-up is required. No medical monitoring of any sort is performed once the officer begins working. As Judge Posner of the Seventh Circuit observed in Heiar v. Crawford County:
[T]he failure to require annual physical examinations of its deputy sheriffs rather belies any claim that it thinks the sheriff's department should be composed of "active, vigorous, physically capable men."
746 F.2d at 1199. The Department of Wildlife Conservation's lack of active concern for the health of its conservation officers *1182 also belies its claims of any health or physical fitness standard.
17. Further, the lack of health monitoring is probative evidence on whether the stated "qualification" of some undefined low risk of incurring a coronary event is indeed a qualification for the job and reasonably necessary to it.
18. Law enforcement personnel are retained even with known heart disease. The Department neither tests for nor examines risk analysis data for predicting heart disease. This suggests that the Department is not overly concerned with the public safety implications of undetected heart disease. Heiar v. Crawford County, 746 F.2d at 1198.
19. The presence or absence of undetected heart disease has limited public safety implications. This is clear from the actual result of officers' coronary events on the job within the Department of Wildlife Conservation, and from common sense, which dictates that such an event, while unfortunate for the officer experiencing it, is unlikely to endanger the public or diminish the effectiveness of the Department's operation. See EEOC v. State of Florida, et al., 40 Daily Labor Reporter (BNA) E-1 at E-3 (February 28, 1986) (N.D.Fla.1986). Management and conservation of Mississippi's wildlife resources is the essence of the business of the Department of Wildlife Conservation, not vague efforts to protect officers who work for the Department. See Criswell, 105 S.Ct. at 2748; EEOC v. State of Florida, supra, at E-3.
20. This Court therefore finds that Defendants have failed to prove the specific, particularized qualifications, reasonably necessary to the essence of the business, that must be proven in a bona fide occupational qualification defense. Therefore Plaintiff prevails and Defendants must comply with the provisions of ADEA, as amended in 1986, with regard to hiring and retirement age restrictions for the conservation officers.
21. However, assuming arguendo that Defendants did establish a particular set of qualifications reasonably necessary to the essence of the Department's business, Defendants would still have failed to establish the BFOQ for the job of conservation officer.
22. If reasonably necessary qualifications were established, the Department would then be put to prove it is compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry, Criswell, 105 S.Ct. at 2751, because either all or nearly all conservation officers or applicants outside the age restrictions do not possess these qualifications or it is highly impractical to test individually for the presence of the qualifications. Id. at 2756.
23. Witnesses for Defendants variously claim that persons over 60 have a lower aerobic capacity, that they are likely to have a certain degree of arterial blockage, and that as a group they have a higher reaction time, less vigilance, and less physical strength than younger individuals. Witnesses for the Defendants state that older individuals lack the physical conditioning of younger individuals that might enable the younger individuals to respond appropriately to an emergency situation.
24. Plaintiff's expert witnesses contend that since no specific level of fitness is specified by Defendants, no determination may be made that all or nearly all conservation officers outside the Department's age restrictions do not possess them. Defendants, having relied on "evidence on general debilitating effects of age" rather than demonstrating specific qualifications that the officers lack, have failed to establish a BFOQ on the grounds that all or nearly all officers lack the qualifications. University of Texas Health Science Center at San Antonio, 710 F.2d 1091, 1094 (5th Cir.1983).
25. A second-prong showing such as that made by Defendants relies on "precisely the stereotypical thinking that the ADEA was designed to prevent," Usury v. Tamiami Trails Tours, Inc., 531 F.2d at 234, and is as a matter of law insufficient.
*1183 26. Specifically with regard to the question of coronary artery disease, and assuming arguendo that the lack of significant coronary artery disease is a qualification for the job, Defendants have failed to prove that all or nearly all conservation officers over the age of 60 have such disease, or that it is highly impractical to test for the presence of the disease.
27. As to the question of whether it is highly impractical to test for other physical and mental attributes, Plaintiff's experts testified, and this Court agrees, that the Department already has the means available to measure the effectiveness and readiness of each officer. Valuable information on each officer's information processing abilities, judgment and reaction time, as well as physical agility and visual acuity are measured by the night stress course. The performance evaluation measures effectiveness.
28. Further, the Department is a small one, and management has access to a wealth of information on the performance of its officers, including supervisors' continuing assessments and the feedback of the community. Former Chief Strong's statement that he knew which officers were effectively performing their jobs and which were not constituted an admission that not only is it practical for the Department to individually assess the effectiveness of its officers, but that it already does so.
29. The Department does not test its incumbent law enforcement population for health or physical fitness, despite the evidence that such testing is relatively inexpensive and convenient. The conclusion compelled by their lack of testing, that is, the Defendants do not care, cannot be dispelled by invoking the fallibility of health and physical fitness testing:
The fallibility of fitness tests is significant only in relation to the consequences of retaining a physically unfit employee. It is one thing for a pilot to collapse at the controls of a plane and another thing for a bookkeeper to collapse while entering debits in a ledger. Obviously the rural policemen in this case are somewhere in between these extremes, and we can use the fact that their employer does not require any physical examinations to place them nearer one end or the other.
Heiar v. Crawford County, 746 F.2d at 1198. The Seventh Circuit's conclusion that fallibility of tests will generally not buttress the case for a BFOQ for a law enforcement position is consistent with the Supreme Court's later statement in Criswell that safety considerations are "only relevant at the margin of a close case, and do not relieve the employer from its burden of establishing the BFOQ by a preponderance of credible evidence." Criswell, 105 S.Ct. at 2754 n. 29.
31. The EEOC, the agency responsible for interpreting and administering the ADEA, has provided further guidance on the employer's burden of proof in these cases. The EEOC states that
If the employer's objective in asserting a BFOQ is the goal of public safety, the employer must prove that the challenged practice does indeed effectuate that goal and that there is no acceptable alternative that would better advance it or equally advance it with less discriminatory impact.
29 C.F.R. 1625.6(b) (1984). The regulations promulgated by the EEOC should be given considerable respect in interpreting the scope of the BFOQ defense. Johnson v. American Airlines, Inc., 745 F.2d 988, 993 (5th Cir.1984).
32. The age restrictions instituted by Defendants in July, 1985, will not achieve a goal of fitness and health. Minimal health and fitness testing for incumbents is a practical and reasonable alternative that would be less discriminatory and would better or at least equally advance a goal of fitness and health with "less discriminatory impact."
33. Defendants have failed to meet their burden of proving, by a preponderance of the evidence, that there exist certain qualifications for the job of conservation officer within the Department of Wildlife *1184 Conservation, Bureau of Fisheries and Wildlife, and determining their presence in employees compels the use of the newly-instituted age restrictions.

CONCLUSION
The Court therefore specifically finds that Miss.Code Ann. § 49-1-15 (Supp.1985) which became effective July 1, 1985, violates Section 4(a) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a) in that it requires mandatory retirement of conservation officers of the Department of Wildlife Conservation at age 60 (62 from July 1, 1985, to June 30, 1986) and maximum hiring at age 35 and is unenforceable. The Court hereby orders that all conservation officers who have been retired between July 1, 1985, and June 30, 1986, solely on account of their having reached the age of 62 and since July 1, 1986, solely on account of their having reached the age of 60, who choose to return to work, shall be reinstated as of March 2, 1987, provided such officer shall not have reached the age of 65. The Court orders that any conservation officer who has been so retired shall be paid back pay in accordance with the terms of the Agreed Order on Backpay Calculation Method being entered contemporaneously herewith. The Defendants are further ordered to refrain from using a maximum hiring age of 35 years for conservation officers.
A separate Judgment in conformance with these Findings of Fact and Conclusions of Law will be entered contemporaneously herewith in accordance with Rule 58 of the Federal Rules of Civil Procedure.