631 F.Supp. 1506 (1986)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
STATE OF NEW JERSEY, New Jersey State Police, et al., Defendants.
Nos. 84-2733, 85-2905.
United States District Court, D. New Jersey, Civil Division.
April 10, 1986.
Carmen R. Matos, Reginald L. Sydnor, Philadelphia, Pa., for plaintiff, E.E.O.C.
Irwin I. Kimmelman, Atty. Gen., State of N.J. by Jonathan L. Williams, Michael R. Clancy, Deputy Attys. Gen., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
BARRY, District Judge.
On August 8, 1985, after hearing twelve days of testimony from thirty witnesses in Civil No. 85-2905, this court denied the preliminary injunction sought by the Equal *1507 Employment Opportunity Commission ("EEOC"), and L.1985, c.175, which reestablished the long-standing mandatory retirement age of 55 for all sworn members of the New Jersey State Police, became effective on September 1, 1985. The court's 52 page opinion stated, in conclusion, that
[P]laintiff has demonstrated little likelihood of success on the merits. Rather, defendants have made a substantial showing 1) that health and fitness are reasonably necessary to the essence of the business of the State Police which is to enforce the law and protect the public; 2) that all or substantially all State Police Officers aged 55 and over cannot safely and efficiently perform State Police duties because of diminished aerobic capacity; and 3) that a large percentage of officers aged 55 and older possess significant, but silent, coronary artery disease which would place themselves and others at risk during the performance of arduous State Police duties, and that the presence of coronary artery disease of this magnitude cannot be determined among officers over age 55 on an individualized basis except with reference to age.
This decision was not appealed to the Court of Appeals for the Third Circuit, and 62 sworn members aged 55 and older were mandatorily retired on September 1.[1]
Following another four days of testimony from 16 witnesses, trial on the merits in Civil No's. 84-2733 and 85-2905 has now concluded.[2] Plaintiff established its prima facie case in both cases; indeed, it was undisputed that the mandatory retirement age of 55 at issue in both cases restricts the continued employment of sworn New Jersey State Police officers solely with reference to age. The burden thus shifted to defendants to demonstrate that those age restrictions constituted Bona Fide Occupational Qualifications ("BFOQ") within the meaning of the Age Discrimination in Employment Act ("ADEA") and, more specifically, 29 U.S.C. § 623(f)(1). Defendants rested on the substantial factual showing made by them at the preliminary injunction hearing[3] and plaintiff proceeded to attempt to rebut that substantial showing. The evidence that plaintiff has presented has, if anything, strengthened the showing that defendants had heretofore made, and defendants surrebuttal case rendered inescapable the conclusion that I now reach as a matter of law  the mandatory retirement age of 55 established by L.1985, c.175 at issue in Civil No. 85-2905 and the mandatory retirement age of 55 at issue in Civil No. 84-2733 are valid and enforceable under the ADEA as BFOQ's which are reasonably necessary to the performance of the duties of the New Jersey State Police.
The court will not repeat the procedural and factual background of Civil No. 85-2905 so fully set forth in its earlier opinion. Neither will it repeat the extensive recitation of the evidence adduced at the earlier hearing except as necessary to provide context. Rather, the court will focus on that evidence which was presented at the trial *1508 in these consolidated actions and the effect of that evidence on the factual and legal conclusions heretofore made.

A. Continued Health and Fitness of all sworn members of the New Jersey State Police is Essential to Performance of that Agency's Public Safety Mission

There continues to be no serious dispute that the continued health and fitness of New Jersey State Police officers is essential to the safe and efficient performance of their law enforcement duties. Defendants have amply demonstrated the commitment of the New Jersey State Police to maintaining the continued health and fitness of its sworn members and plaintiff's experts have not challenged this demonstration in any meaningful way. As noted in my earlier opinion, the findings of which are incorporated by reference herein, prior to 1983 all officers participated in an annual fitness test, which measured the ability to perform rudimentary physical activities. See 620 F.Supp. at 985. As a result of the efforts of the State Police to reassess its physical fitness program following the decision of the Supreme Court in EEOC v. Wyoming, supra, it developed a comprehensive In-Service Fitness Screen to evaluate the physical condition of its members. Id. Following that assessment, the New Jersey State Police established what is known as the Well Trooper Program, which requires all sworn members to undergo complete annual medical examinations. In addition, as of the date of my earlier opinion, the Superintendent of State Police was awaiting the recommendation of a Physical Standards Committee as to ongoing physical training and performance standards for the State Police, as well as recommendations from the Duty Status Review Board as to appropriate action to be taken with respect to officers with health problems. Id. at 986.[4]
The testimony at trial has confirmed this court's prior findings as to the critical importance of the continued health and fitness of sworn New Jersey State Police officers, as well as the ongoing commitment of the New Jersey State Police to assure that all sworn members, of whatever age, possess the level of physical and medical fitness needed to safely and efficiently perform their duties. Specifically, the New Jersey State Police has continued not only the free medical care that has always been available but also its Well Trooper Program, with medical examinations of all sworn members presently being performed. In addition, a physical standards program has been adopted under which sworn members will pursue physical training and, commencing in the Spring of 1986, will be tested in a test to be given twice a year for adequate performance of a number of physical exercises, including a 1.5 mile timed run which will assure that all members possess a level of aerobic capacity of at least 41 mililiters of oxygen per kilogram per minute ("ml/kg/min."). With proper training, officers under age 55 of both sexes will be able to achieve and to maintain the aerobic capacity of 41 ml/kg/min. which I earlier found to be the minimum capacity necessary to perform basic law enforcement tasks. It should be noted that if an officer does not successfully complete the test or fails to take the test he or she shall be subject to reclassification in the former instance and disciplinary action in the latter.
Of equal significance are the efforts the New Jersey State Police has undertaken to review the duty status of its sworn members in light of their physical and medical conditions. The Superintendent has recently acted upon the recommendations of the Duty Status Review Board regarding the classification of officers in appropriate duty statuses on the basis of their physical and medical conditions. Those individuals classified as "permanently disabled" as a result of diagnosed heart conditions or other physical or medical problems precluding *1509 the safe and efficient performance of their duties are being required to retire. As one of plaintiff's experts observed, "It's pretty harsh in some cases, but I must admit they're attempting ... to do something about the health and fitness of the organization." T.306. During the processing of such retirement applications and the pendency of any administrative appeals regarding the classification of an individual as "permanently disabled",[5] the officers affected have been placed in protective assignments which preclude their participation in any field law enforcement functions. However, all officers forced to leave the New Jersey State Police have been assured that, consistent with the Superintendent's past practice as to all officers (including those subject to mandatory retirement), all possible assistance will be provided to enable the affected individuals to secure suitable alternative employment.
The EEOC, in its attempt to show that health and fitness are not as important to the New Jersey State Police as it suggests, points to at least 59 sworn members with temporary or permanent disabilities and others whom the EEOC describes as having "serious" medical problems and who were still employed as of the date of trial. In this attempt, the EEOC ignores the fact that it is only recently that the Duty Status Review Board submitted its recommendations to the Superintendent and he immediately began to act on those recommendations. If over the many years of the existence of the State Police it was able to take care of its own including those injured in the line of duty, it has recognized for some time that, consistent with the paramilitary nature of the organization and the sincere emphasis it places on health and fitness, it cannot do so now. This tragic consequence prompts me to note that it comes with some ill grace for the EEOC in the course of raising the rights of one group to suggest that others should be precipitously discharged.
The EEOC also points to the testimony of Dr. Richard Mostardi, a physiologist who testified on behalf of the EEOC and offered his opinion that while some health and fitness is necessary to perform the job of a New Jersey State Police officer, the level of health and fitness defendants require is unnecessary. This opinion, which I reject, was based on four conclusions: (1) there has not been a meaningful evaluation of health and fitness during the careers of New Jersey State Police officers and the programs now in place, while "excellent", "meaningful", and "acceptable", would have to be functioning at a high level of efficiency for several years to be significant; (2) there are a number of officers with serious medical problems who have performed their assigned duties effectively and efficiently;[6] (3) based on his discussions with the supervisors of six officers aged 55 and older who worked for a short time at tasks of which Dr. Mostardi was unaware, those officers also functioned effectively ("That is a small component as it applies to my opinion" T.309); and (4) there is much emphasis on health and fitness upon entry into the State Police yet, from that point on, officers are never again checked.
*1510 Dr. Mostardi's conclusions as to # 1 and # 4 are wholly belied both by the record and the reasons set forth herein and in my earlier opinion. And while there is no dispute as to # 2 and # 3, those conclusions are not relevant to the issues before me. Relevant they would have been, of course, had I acceded to the EEOC's repeated entreaties to overrule EEOC v. Commonwealth of Pennsylvania, 768 F.2d 514 (3d Cir.1985), insofar as the Third Circuit adopted the Mahoney formulation[7] for defining "occupations" in paramilitary police organizations in which all relevant personnel are required to be ready for emergency action regardless of rank and general duties. This, of course, I had no power to do even if, as the EEOC argued, the Third Circuit's decision was in "direct conflict" with Criswell v. Western Airlines, ___ U.S. ___, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) and Trans World Airlines, Inc. v. Thurston, ___ U.S. ___, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), which it was not.
In any event, the EEOC agreed during the course of the preliminary injunction hearing that the New Jersey State Police was a paramilitary organization, that EEOC v. Commonwealth of Pennsylvania was controlling and, thus, that there was no point in presenting evidence that officers aged 55 and older safely and efficiently performed their assigned tasks. That the EEOC continually attempted to reverse this position at trial and in the Proposed Findings of Fact submitted following trial indicates a fundamental misunderstanding of the issues before this court. Indeed, the one fact with which no one took issue at any time was that officers aged 55 and above safely and efficiently performed their assigned duties, as opposed to being able to safely and efficiently take action in critical situations involving arduous activities.
This court finds, as more fully set forth in the earlier factual findings which have been incorporated herein by reference, that the continued health and fitness of all sworn members of the New Jersey State Police is clearly essential to the safe and efficient performance of the mission of the New Jersey State Police of protecting the public and enforcing the law.

B. The Decline in Physiological Functions with Age  "All or Substantially All"

As noted in the earlier findings of fact, the New Jersey State Police presented compelling evidence that a minimum aerobic capacity of 41 ml/kg/min. is required to safely and efficiently perform many of its critical law enforcement functions. See 620 F.Supp. at 987-990 & n. 10. The overwhelming, and largely undisputed, evidence presented to the court at the preliminary injunction hearing demonstrated that all or substantially all officers  probably as many as 97.5%  will not possess this level of aerobic fitness by age 55. The evidence adduced at trial served only to confirm this earlier determination.
Dr. Mostardi agreed that at least 95% of persons over age 55 will not have an equivalent level of aerobic fitness, as expressed in liters of oxygen consumed per minute. He also agreed that the 1.5 mile time run included as part of the New Jersey State Police's physical standards testing will provide an effective measure of the requisite level of aerobic fitness of 41 ml/kg/min. It, therefore, was not surprising that he did not dispute that all or substantially all New Jersey State Police officers would not possess an aerobic capacity of 41 ml/kg/min. by age 55.[8]
*1511 The primary basis for this expert's rejection of the aerobic capacity justification for age 55 as a BFOQ was the fact that he was not convinced that New Jersey State Police duties required a level of aerobic fitness of 41 ml/kg/min. or, as expressed by him, an absolute aerobic capacity of 3.0 liters per minute. Without questioning the veracity of the approximately 1800 summaries of arduous State Police tasks set forth in defendants' Exhibit 7 in evidence, he contended that he would need "more details" to make a judgment as to the aerobic requirement of New Jersey State Police duties. In light of the uncontroverted testimony presented by defendants' expert that minimum aerobic values could easily be assigned to many of the summarized arduous tasks by reference to established physiological norms, Dr. Mostardi's opinion has little probative value insofar as it is based upon a purported absence of proof that many New Jersey State Police duties require an aerobic capacity of 41 ml/kg/min. Indeed, Dr. Mostardi conceded that some of those arduous tasks would require an aerobic capacity of at least such a level.[9]
In conclusion, no evidence was presented to this court at trial to raise any question as to the conclusion reached after extended discussion in my earlier opinion that a minimal aerobic capacity of 41 ml/kg/min. is required to perform essential New Jersey State Police duties. Moreover, Dr. Mostardi agreed that all or substantially all officers over the age of 55 would not possess such a level of aerobic fitness. This court therefore finds and determines that all or substantially all officers aged 55 and over would not possess the aerobic capacity needed to perform essential New Jersey State Police functions.

C. Incidence of Latent Coronary Artery Disease in State Police Officers Age 55 and Over Cannot be Detected on an Individualized Basis

In the findings entered following the preliminary injunction hearing, this court concluded that a substantial number of New Jersey State Police officers aged 55 and older would possess significant, but asymptomatic, coronary artery disease which would interfere with the safe and efficient performance of essential New Jersey State Police duties, as well as preclude the testing of the aerobic capacity of those officers on an individualized basis. See 620 F.Supp. at 990-95. This court also concluded that while factors such as age, sex, smoking, cholesterol, diabetes, and blood pressure can be of assistance in assessing the risk that an individual will or will not suffer silent heart disease, it is impossible to screen for the presence of silent heart disease on an individualized basis absent cardiac catheterization, an invasive technique which is medically impracticable and unacceptable for diagnosing such an asymptomatic population. See 620 F.Supp. at 992-94.
At trial, Dr. David Pryor, M.D., plaintiff's cardiologist, testified  and counsel for EEOC stipulated  that it is, indeed, impossible to detect coronary artery disease of this magnitude on an individualized basis, and that cardiac catheterization is not a practicable alternative.[10] Instead, plaintiff focused its attack on two points: 1) that coronary artery occlusions (or blockages) are not clinically significant until they result in 75% luminal diameter narrowing,[11] *1512 as opposed to the 50% figure relied upon by defendants; and 2) that, in any event, it is unlikely that an officer suffering asymptomatic heart disease will experience a coronary event in circumstances which will present any risk to the officer, a colleague, or a member of the public.
In offering the opinion that coronary artery occlusions of less than 75% luminal diameter narrowing are not significant, Dr. Pryor relied principally on the fact that coronary artery bypass operations will not normally be performed on artery blockages of a lesser magnitude. However, he expressed no opinion whatsoever on the effect of peak exercise on cardiac function in the presence of occlusions of a lesser magnitude, and did not raise any serious question as to the compelling 5-year mortality figures of persons with lesser occlusions presented to the court by defendants. Dr. Pryor's opinion as to the degree of artery occlusion which is considered significant for purposes of surgery (a figure which, it should be noted, is accepted by all the experts testifying in this case) is, therefore, of little or no relevance to this court's evaluation of the degree of coronary artery occlusion which is significant for purposes of the safe and efficient performance of New Jersey State Police duties.
On the contrary, in rebuttal, Dr. Earl W. Ferguson, defendants' expert, who had testified at great length at the hearing on the preliminary injunction and whose testimony I credited then and credit now, emphasized that a 75% luminal diameter narrowing can result in a reduction in blood flow at rest, and that at peak exercise there will be a reduction in blood flow to the heart muscle even where there is only 40-50% luminal diameter narrowing. Moreover, Dr. Ferguson noted that there is no direct correlation between the percent narrowing of an artery and blood flow to the heart due to the cumulative effect of narrowing up and down the vessel. As a result, even coronary artery disease of a surgically insignificant magnitude which occurs all along a blood vessel when "added up" can significantly affect blood supply to the heart, especially at peak exercise, and present a significant risk of a heart attack or death. Moreover, the 5-year mortality of individuals with only 30% occlusions, which are surgically minimal, increases three to five fold. Thus, concluded Dr. Ferguson, the surgical standard of 75% luminal diameter narrowing is "far too tough" in the context of evaluating the validity of a retirement age as a BFOQ for law enforcement officers and is "frankly ridiculous" as a standard for evaluating which officers suffer from heart disease significant enough to adversely affect the performance of their duties.
Plaintiff also offered little persuasive evidence to support the conclusion of Dr. Pryor that the risk of a cardiac event adversely affecting the performance of law enforcement duties by an officer is so small as not to warrant consideration. No foundation and no facts were offered in support of any specific numerical conclusion as to the supposedly small likelihood of a cardiac event resulting in a critical failure of job performance. While conceding that persons aged 55 and above have the highest percentage of coronary artery disease, Dr. Pryor relied upon the fact that no officer over age 55 had suffered a cardiac event during performance of a critical job function in concluding that the risk of such an event is small.[12] Dr. Pryor, however, was unaware of the fact that officers over age 55 served only during the brief 28 month period when the New Jersey State Police did not have a mandatory retirement age of 55. The past experience of the New Jersey State Police thus provides no factual basis *1513 for evaluating the prospective risk of such critical cardiac failures in the absence of mandatory retirement. Indeed, it supports the conclusion that the prior long-standing policy of mandatory retirement assisted in preventing the occurrence of such unfortunate events.
Critical in this regard was the fact that Dr. Pryor did not address the significance with reference to cardiac risk presented by the performance of the demonstrably arduous duties commonly performed by sworn members of the New Jersey State Police in particular, or the effect of physically demanding activities in general. Dr. Pryor had no background in public safety functions and, thus, could not express an opinion as to the former factor and did not offer an opinion from a cardiological point of view as to the latter factor. However, Dr. Ferguson noted that 25% of persons who die of sudden cardiac death have no prior symptoms  as stated by him, "the first onset is sudden death" (T. 527). Moreover, Dr. Ferguson noted that peak exercise increases the risk of experiencing a coronary event 55 times in a person with significant disease.
The danger presented to the public safety by the possibility of such sudden fatal cardiac episodes was further emphasized in the context of the usefulness of the exercise stress test. This court has concluded  and plaintiff has now agreed  that such exercise stress tests cannot reliably identify the specific individuals suffering from significant coronary artery disease. However, it is noteworthy that sudden cardiac death or myocardial infarction ("heart attack") is much more likely to occur in persons with a "normal" stress test result.[13] For example, in a study of 900 Indiana State Police officers, 94% of the persons suffering sudden cardiac death or acute myocardial infarction had a "normal" exercise test result. The clear and substantial risk which would be presented by permitting individuals with significant but asymptomatic heart disease to perform arduous protective service functions was further emphasized by studies of fire fighters, which indicate that 44% of all deaths of fire fighters resulted from heart disease, and that half of those deaths occurred while the officers were fighting fires. Moreover, half of the cardiac deaths suffered by the fire fighters were thought to be exercise related and sudden death and myocardial infarction is much more likely to occur at levels of peak activity. This clearly suggests that the risk of such cardiac events is a significant problem and is directly associated with the arduous functions for which all members of a para-military organization such as the New Jersey State Police are required to be ready.
In conclusion, defendants have shown by overwhelming evidence that a significant number of New Jersey State Police officers aged 55 and older would suffer significant but asymptomatic coronary artery disease. They have also shown that the risk of sudden death or disability presented by disease of this magnitude would prevent those officers from safely and effectively performing the arduous physical tasks which they are charged with being able to perform as part of their job duties. Defendants have proven as well  and plaintiff has now stipulated  that it is impossible and impracticable to screen for the presence of silent heart disease of this magnitude on an individualized basis. Moreover, as set forth in the findings of this court in its earlier opinion, it is clear that age, the single greatest risk factor, is an appropriate "proxy" in assessing the continued cardiac fitness of New Jersey State Police officers in light of the exponential increase in heart disease at ages 50-55. 620 F.Supp. at 994-95.

* * *
The law under which this evidence must be judged is fully set forth in my earlier opinion. Suffice it to say that the ADEA generally prohibits discrimination against individuals with respect to the terms or conditions of employment on the basis of *1514 an individual's age unless it can be shown that such age-based restrictions constitute a BFOQ which is reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age. 29 U.S.C. § 623(a)(1) & (f)(1). The BFOQ exception is construed narrowly; however,
[I]n certain times of particularly arduous law enforcement activity, there may be a factual basis for believing that substantially all employees above a specific age would be unable to continue to perform safely and efficiently the duties of their particular jobs, and it may be impossible or impractical to determine through medical examinations, periodic reviews of current job performance and other objective tests the employees' capacity or ability to continue to perform the jobs safely and efficiently.
Western Airlines, Inc. v. Criswell, supra, ___ U.S. ___, 105 S.Ct. at 2752. Moreover, "The uncertainty implicit in the concept of managing safety risks always makes it `reasonably necessary' to err on the side of caution in a close case." Id. at 2754 (footnote omitted).
The validity of a BFOQ is evaluated under the two-part test first articulated by the Fifth Circuit in Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224 (5th Cir. 1976). That test requires a defendant to demonstrate that (1) the job qualification sought to be furthered by the age restriction is reasonably necessary to the essence of the business, and that (2)(a) there is a reasonable factual basis for believing that all or substantially all persons over the age at issue would be unable to safely and efficiently perform the duties of the job involved, or (b) it is impossible or highly impractical to evaluate the continued fitness of older employees on an individualized basis. Western Airlines, Inc. v. Criswell, supra, ___ U.S. ___, 105 S.Ct. at 2751-52.
Here, as should by now be clear, defendants have demonstrated by overwhelming evidence that the continued health and fitness of all sworn police officers  the goal sought to be furthered by the mandatory retirement age  is essential to the normal operation of its law enforcement functions. The New Jersey State Police has an established policy of providing comprehensive medical care at no cost to all sworn officers. This program has recently been supplemented by what is known as the Well Trooper Program, under which all sworn officers receive a complete medical examination every year. With the current implementation of a revised physical standards program and the implementation of what the Superintendent has called "hard decisions" with respect to the duty status (and in some cases forced retirement) of sworn officers with significant known health problems, there is no question as to the resolve and commitment of defendants to the maintenance of the continued health and fitness of all sworn officers. Compare EEOC v. Commonwealth of Pennsylvania, 768 F.2d 514, 518 (3d Cir.1985); Hahn v. City of Buffalo, 770 F.2d 12, 15 (2d Cir.1985).
As more fully discussed in my earlier opinion, there is also no question that the continued health and fitness of sworn members of the New Jersey State Police is, indeed, essential to the safe and efficient performance of the protective service function performed by them. New Jersey State Police officers are commonly called upon to perform law enforcement duties which are physically arduous in the extreme in circumstances in which the inability to safely and efficiently perform those physical duties could endanger the officer involved, his or her colleague, or members of the public which the State Police is charged with protecting. Accordingly, this court finds and determines as a matter of law that the continued health and fitness of sworn New Jersey State Police officers is essential to the performance of the business of protecting the public.
Defendants have proven as well that all or substantially all officers do not possess the level of aerobic fitness which is required to safely and efficiently perform those State Police duties. Defendants have demonstrated beyond any doubt that a minimum level of aerobic fitness of 41 ml/kg/min. is required to perform those *1515 duties, and all of the experts who testified in this area  including those of plaintiff  agree that at least 95% of officers aged 55 and older would not possess this level of aerobic fitness. Accordingly, the court finds and determines as a matter of law that the mandatory retirement age at issue in these cases is valid as a BFOQ on this basis.
The court also finds and determines as a matter of law that a significant number of sworn New Jersey State Police officers aged 55 and older would possess significant, but asymptomatic, coronary artery disease which would have a high likelihood of adversely affecting the safe and efficient performance of their job duties if that disease could not be diagnosed in advance on an individualized basis. As my prior opinion notes, there is some dispute as to the precise extent of the prevalence of significant coronary artery disease among persons of this age group and there is some dispute as to the precise level of coronary artery occlusion constituting "significant" coronary artery disease. However, there is no dispute whatsoever that the incidence of significant coronary artery disease increases exponentially in this age group and that the likelihood of a serious or fatal coronary event is similarly exponentially increased when individuals suffering such asymptomatic heart disease are required to perform duties at peak exertion. All experts agree that age is the single most important conventional risk factor and that an individual aged 55-64 is 80 times more likely to die of heart disease as an individual 25 to 34.
Moreover, this court finds and concludes (and, indeed, the parties have now stipulated) that while the presence of such disease can be ascertained on an individualized basis by the use of cardiac catheterization, the use of this invasive and dangerous procedure is simply not practicable and no other diagnostic technique is sufficiently reliable. Indeed, the presence of asymptomatic heart disease of itself precludes testing individuals aged 55 and over for the presence of the aerobic capacity necessary to perform New Jersey State Police duties. Accordingly, it is not possible to ascertain on an individualized basis which officers aged 55 and older possess a level of coronary artery disease which would preclude the safe and efficient performance of their duties and, thus, the risk involved in permitting them to continue to fulfill those duties cannot be identified. These factors, together with the marked increase of significant coronary artery disease in this age group, establish age as an appropriate "proxy" for the job qualification of continued health and fitness. See Western Airlines, Inc. v. Criswell, supra, ___ U.S. ___, 105 S.Ct. at 2751-52.
Judgment will be entered in favor of defendants in Civil No's. 84-2733 and 85-2905. Counsel for defendants are to submit an order reflecting this opinion within ten days.
NOTES
[1] The opinion was read into the record on August 8, 1985 and was subsequently published. EEOC v. State of New Jersey, et al., 620 F.Supp. 977 (D.N.J.1985).
[2] The court on its own motion consolidated the cases following the decision on the preliminary injunction. In 84-2733, filed prior to the enactment of L.1985, c.175, the EEOC sought a determination of the invalidity of the New Jersey State Police mandatory retirement statute which, until March 2, 1983, required the retirement of all sworn members at age 55. That statute was declared unenforceable by the Attorney General of the State of New Jersey as of that date, the date of the decision of the Supreme Court in EEOC v. Wyoming, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), because no facts existed at that time to support age 55 as a Bona Fide Occupational Qualification ("BFOQ"). After a study which concluded that a mandatory retirement age of 55 was a BFOQ for the job of a New Jersey State Police officer, the Attorney General supported the legislation ultimately adopted as L.1985, c.175. Civil No. 84-2733 seeks damages and reinstatement on behalf of officers retired pursuant to the earlier statute. The parties agree, and I find, that the factual and legal issues to be considered in Civil 84-2733 are, for all intents and purposes, identical to those in Civil No. 85-2905 and the validity of both statutes under the Age Discrimination in Employment Act ("ADEA") will, therefore, be determined.
[3] By agreement of the parties, the record of the preliminary injunction hearing was incorporated by reference.
[4] By pointing to the Duty Status Review Board and the physical fitness screen as alternatives to age which would better advance the goal of public safety (see, e.g. Conclusions of Law, ¶ 196), the EEOC implicitly concedes the emphasis the New Jersey State Police places on health and fitness.
[5] EEOC's complaint that those sworn members over age 55 do not have an appeal mechanism ignores both what this court is now doing and the reasons why age 55 is a BFOQ.
[6] Dr. David Pryor, plaintiff's cardiologist, also testified in this regard yet came to a contrary result. Dr. Pryor found a number of officers who had indicated medical "conditions that could potentially limit the quality, activity or life expectancy of a particular individual" and "impair an ability to perform". T.379 (emphasis added). That conclusion, together with his belief that the New Jersey State Police is doing "an admirable job", enabled him to further conclude that "perfect or prime physical abilities" are not necessary to the business of the State Police. T.380. I reject this testimony. First, whether one or 1000 officers complained of the conditions Dr. Pryor described, those conditions have been and are being dealt with in the ways described in this opinion and in my earlier opinion, including involuntary retirement especially, I suggest, if there could be impaired performance. Second, if one accepts Dr. Pryor's conclusion, which I do not, that a large number of officers have an impaired ability to perform, it follows that the New Jersey State Police could not be doing an "admirable job" particularly in those critical emergency situations so well documented in the record.
[7] Mahoney v. Trabucco, 738 F.2d 35, 39 (1st Cir.), cert. denied ___ U.S. ___, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).
[8] Plaintiff's industrial psychologist, Erich Prien, Ph.D., concluded his testimony with the statement that, without reference to the underlying physical condition of a 55 year old, if he or she could perform certain physical activities there need be no age limitation (T.203-04). Not surprisingly, the EEOC, in its 149 Proposed Findings of Fact spread over 46 pages, does not press this testimony. Indeed, other than Proposed Finding # 70, which reflects that minute part of his testimony in which he suggested that a link between age and job performance and requirements had not been established, a suggestion wholly belied by this record, the EEOC does not offer Dr. Prien's testimony for purposes of this decision.
[9] Dr. Mostardi observed that factors such as experience and intelligence were equal to or more important than an aerobic capacity of 3.0 liters per minute. While not demeaning the importance of such factors, it is obvious, as Major Edward Martin testifying for plaintiff candidly agreed, that at some point experience must give way to replacement. T.100.
[10] Wholly ignoring this stipulation and, indeed, ignoring the entire subject of catheterization in its Proposed Findings of Fact, the EEOC urges me to find that "non-invasive tests are available" (Conclusions of Law, ¶ 196), including the exercise stress test, the weaknesses of which the EEOC explicitly recognizes (see, e.g. Proposed Findings of Fact, ¶ 135) and implicitly recognized by entering into the stipulation which it now seeks to avoid. For the reasons set forth in this opinion and in my earlier opinion, I will not so find.
[11] "Luminal diameter narrowing" refers to the percentage of the diameter of the blood vessel which is blocked by atherosclerotic plaques. This measurement is to be distinguished from the measurement of the percent occlusion of the cross-sectional area of a vessel, which figure can be calculated on the basis of the amount of luminal diameter narrowing. For example, a 75% luminal diameter narrowing results in a 95% occlusion of the cross-sectional area of a blood vessel; a 50% luminal diameter narrowing results in a 75% decrease in the cross-sectional area of the blood vessel; and a 25% luminal diameter narrowing results in a 44% decrease in the cross-sectional area of a blood vessel.
[12] His testimony that most of the cases of expected coronary disease are going to be in the under age 55 population and very few cases in the over age 55 population was based on nothing other than the fact that he included 1812 persons in the younger age group and 40 in the older age group.
[13] Indeed, plaintiff called Detective Joseph P. Robe who testified that he suffered a heart attack three days after having taken a stress test and having been given a "clean bill of health" by a cardiologist. (T.138)