EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff-Appellant,

v.

MISSISSIPPI STATE TAX COMMIS-
SION, Defendant-Appellee.

No. 87–4659.

United States Court of Appeals,
Fifth Circuit.

June 21, 1988.

Peggy R. Mastroianni, Charles A. Sha-
nor, Gen. Counsel, E.E.O.C., Washington,
D.C., for plaintiff-appellant.

John T. Kitchens, Asst. Atty. Gen., Ed-
win Lloyd Pittman, Atty. Gen., Bobby R.
Long, Chief Atty., Miss. State Tax Comm.,
Jackson, Miss., for defendant-appellee.

Before GOLDBERG, RUBIN, and
JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The Equal Employment Opportunity
Commission appeals a district court deci-
sion that the Mississippi State Tax Commis-
sion established "physical stamina and the
ability to withstand stressful working con-
ditions" as bona fide occupational qualifica-
tions under the Age Discrimination in Em-
ployment Act,[1] justifying the retirement at
age 60 of officers charged with enforcing
the State's highway tax laws. Because the
Tax Commission did not develop, imple-
ment, and enforce minimum health and fit-
ness standards for the retention of officers
on the force, the Commission failed to es-
tablish physical stamina and the ability to

1. 29 U.S.C. § 623(f) (1982).

manage stress as BFOQs. We therefore reverse the decision of the district court and remand for a determination of the backpay due to officers who were involuntarily retired.

## I.

The Mississippi State Tax Commission (MSTC) is responsible for general revenue collection. In 1980, the Mississippi legislature abolished an agency known as the Motor Vehicle Comptroller's Office and transferred responsibility for the collection of highway taxes to the MSTC. A.C. Lambert, Sr., then chairperson of the MSTC, undertook to overhaul the highway tax collection department because, in his words, "It was determined to be ineffective, no leadership, eaten up to some extent with fraud."

Assisted by Wood Stringer, a career law enforcement officer, Lambert sought to clarify and to redefine the responsibilities of the highway tax collection department. With the ultimate approval of the state legislature, Lambert and Stringer divided the workforce into three levels of scales-enforcement officers and delineated their duties for enforcing laws pertaining to the registration, licensing, and taxation of commercial trucks using the state highways.[2] The officers were authorized to search vehicles for contraband [3] and to pursue and arrest truckers who resisted or attempted to avoid the weighing and inspection of their vehicles. To enable the officers to perform these duties, Stringer and Lambert required them to wear uniforms, to drive patrol cars, and to bear weapons.[4] Job applicants had to complete Law Enforcement Academy training,[5] and all officers had to take semiannual weapons-qualification tests. Finally, Stringer and Lambert recommended and the legislature en-

acted a mandatory retirement age of 60 for all scales-enforcement officers.[6]

The EEOC challenged the mandatory retirement age as violative of the Age Discrimination in Employment Act (ADEA).[7] After a bench trial, the district court found that scales-enforcement officers face dangers and physical rigors in their work. The court recounted testimony showing that confrontations with truckers may become violent. Chases in pursuit of truckers who attempt to bypass the scales may reach speeds of 80 or 90 m.p.h. Portable scales officers may lift from 40 to 100 pounds of scales out of their vehicles several times a day to weigh trucks at the roadside. Yet "the majority of the officers who testified agreed that most situations were routine and uneventful."

The court also recounted the testimony of Dr. Charles Marx who succeeded Lambert as chairperson of the MSTC in 1985. Dr. Marx testified that the law enforcement division had made significant progress since the days when it was part of the Motor Vehicle Comptroller's Office, but that much still needed to be done. He expressed particular concern about the qualifications of officers who had been employed by the old agency and remained on the force. Marx said that many of them could not meet the physical standards required of newly hired officers at the Law Enforcement Training Academy, although he admitted on cross-examination that, even after the demise of the Motor Vehicle Comptroller's Office, the MSTC had hired officers who failed physical training at the Academy. He dismissed the possibility of firing officers on the ground that they fell short of the Academy's physical standards because the termination procedures promulgated by the State Personnel Board were

---

2. Miss.Code Ann. § 27–5–71 (1972), § 27–5–75 (Supp.1987).

3. Miss.Code Ann. § 63–5–49 (Supp.1987).

4. Miss.Code Ann. § 27–5–75 (Supp.1987).

5. *See generally* Miss.Code Ann. §§ 45–6–1, 45–6–11 (1972).

6. Miss.Code Ann. § 27–5–75 (Supp.1987) provides in relevant part: "From and after July 1, 1985, all inspection station employees and all field inspectors who attain the age of sixty-two (62) years on or before June 30, 1986, and those who attain the age of sixty (60) years thereafter shall be retired forthwith."

7. 29 U.S.C. § 623(a) (1982).

too lengthy and costly to be feasible for a struggling new agency division.

Finally, the district court reviewed the expert testimony. Experts called by the MSTC testified that persons decline in physical and aerobic capacity as they get older and that medical testing cannot reliably reveal all kinds of heart disease. The MSTC also offered a study by the industrial psychology firm of Morris & McDaniel concluding that the scales-enforcement officer's job is a law enforcement position involving occasional confrontations with life-threatening situations. Dr. Morris testified that no occupational test can accurately measure reactions to life-threatening situations. The EEOC's experts testified, on the contrary, that aging is an individual process and that a uniform mandatory retirement age at 60 fails to take account of personal fitness. They maintained that fitness and reaction-time testing were reliable indicators of ability to perform most of the tasks in question.

██ The district court correctly stated the test for determining whether an employer, including a state agency,[8] has established a BFOQ: Under *Western Air Lines v. Criswell* [9] and *Usery v. Tamiami Trail Tours*, [10] employers asserting a BFOQ defense must prove (1) that particular job qualifications are reasonably necessary to the essence of the business and (2) that age is a necessary proxy for these qualifications either because all or substantially all older people cannot perform the job or because individual testing for the qualifications would be highly impractical. Showing appropriate deference to the MSTC's determination,[11] the court identified the essence of the business of scales-enforcement officers as "the enforcement of the laws of the State" and found that

the tasks critical to this mission included pursuit driving, dealing with hostile and aggressive individuals, sometimes restraining truckers by use of force, and observing trucks for violations. Relying on the expert testimony offered by the MSTC, the district court concluded, "physical stamina and the ability to withstand stressful working conditions are essential to the safe and efficient execution of the duties of a Scales Enforcement Officer." The court found further that most people over 60 lacked these qualifications or could not be tested for them on an individual basis. The court held therefore that the MSTC had established a BFOQ.

In reaching this decision, the district court rejected the EEOC's argument that an employer could not prove a BFOQ without first establishing minimum health and fitness standards and somehow monitoring employees for compliance with these standards. Relying on two cases decided in the Eighth and First Circuits, the district court held, as a matter of law, that the " 'failure ... to monitor physical standards ... is not necessarily inconsistent with ... recognizing that certain levels of strength, aerobic capacity, coronary fitness, etc., are necessary for effective police work.' " [12] Having concluded that the implementation and enforcement of minimum health and fitness standards was unnecessary to establishing a BFOQ, the district court made no explicit finding of fact concerning whether or not the MSTC maintained such standards.

## II.

The federal circuits are split on the question whether an employer must implement and enforce minimum standards of "physical stamina" and "the ability to withstand stressful working conditions" in order to

---

**8.** 29 U.S.C. § 630(b) (1982); *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983).

**9.** 472 U.S. 400, 105 S.Ct. 2743, 2751–52, 86 L.Ed.2d 321 (1985).

**10.** 531 F.2d 224, 235–36 (5th Cir.1976).

**11.** *EEOC v. Mississippi,* 837 F.2d 1398, 1400–01 (5th Cir.1988).

**12.** *EEOC v. Mississippi State Tax Comm'n,* No. J83–0717(W) (S.D.Miss. July 10, 1987) (quoting *EEOC v. City of East Providence,* 798 F.2d 524, 529 n. 4 (1st Cir.1986)). *See also EEOC v. Missouri State Highway Patrol,* 748 F.2d 447, 454 (8th Cir.1984), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985).

prove such qualifications reasonably necessary to the essence of the business and to defend age discrimination on this basis. The First and Eighth Circuits hold that testing and monitoring employees for compliance with minimum standards is unnecessary so long as the employer provides "objective evidence on whether the older employees can perform their duties." [13] Those courts accept as adequate evidence, similar to that adduced in this case, showing that the job involves law enforcement activities requiring physical rigor and fitness for safe performance. The Third Circuit, on the contrary, interprets a BFOQ defense based on health and fitness to require a showing that the employer maintains minimum standards throughout the workforce:

> While the ADEA does not require perfect monitoring and maintenance of a particular qualification at all age levels, it does bar selective enforcement of health and fitness requirements. . . . Until minimum standards are developed, implemented and enforced, the PSP [Pennsylvania State Police] cannot justify its mandatory retirement law by relying on good health and physical conditioning as BFOQs reasonably necessary to PSP business. [14]

Our decision in *EEOC v. Mississippi,* [15] issued after the district court's decision in this case, borrows from the Third Circuit's analysis. In that case, conservation officers in the Department of Wildlife Conservation challenged the State's policy of retiring them at age 60. [16] State law required these officers to attend the Law Enforcement Academy and charged them with enforcement of the fish and game laws as well as the laws proscribing cattle theft. [17] Moreover, the State argued to this court that conservation officers faced life-threatening situations in the pursuit and arrest of armed, illegal night-hunters. Although the evidence concerning the conditions of employment and necessary qualifications of conservation officers was markedly similar. to the evidence regarding scales-enforcement officers, the district court in the earlier case held that the State had failed to establish a BFOQ. The court found that the qualifications asserted—"including vigor, strength, quickness, and other imprecise qualities generally thought of as youthful attributes"—were too vague to support a finding of reasonably necessary job qualifications under the first prong of the BFOQ test [18] and that, in any case, the State enforced no such qualifications in that it performed "[n]o medical monitoring of any sort" and indeed retained many younger officers with serious health or fitness problems. [19]

We affirmed the district court's decision. Although we recognized that "[e]mployers are entitled to articulate the qualifications they consider essential to their businesses and to exercise substantial discretion in judging the reasonableness of safety-related job qualifications," [20] we held that the ADEA circumscribed their discretion in an important respect:

> It is the finding of minimum standards that are "developed, implemented and enforced" that provides the threshold limiting an employer's discretion in establishing a BFOQ defense. Not only would a finding of minimum standards limit an employer's discretion, but also it would satisfy the Supreme Court's concern to decrease stereotypes unsupported by objective fact and would ensure both that a

13. *Missouri State Highway Patrol,* 748 F.2d at 454; *City of East Providence,* 798 F.2d at 529.

14. *EEOC v. Pennsylvania,* 829 F.2d 392, 395 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1109, 99 L.Ed.2d 271 (1988). *See also Heiar v. Crawford County,* 746 F.2d 1190, 1198–99 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985); *EEOC v. New Jersey,* 631 F.Supp. 1506 (D.N.J.1986), *aff'd,* 815 F.2d 694 (3d Cir.1987).

15. 837 F.2d 1398.

16. Miss.Code Ann. § 49–1–15 (Supp.1987).

17. Miss.Code Ann. §§ 49–1–13, 49–1–15 (Supp. 1987).

18. *EEOC v. Mississippi,* 654 F.Supp. 1168, 1180 (S.D.Miss.1987), *aff'd,* 837 F.2d 1398 (5th Cir. 1988).

19. *Id.* at 1181–82.

20. *EEOC v. Mississippi,* 837 F.2d at 1400.

good faith decision on required qualifications was made by a competent authority and that the use of age as a proxy was proper.[21]

The enforcement of minimum standards would "decrease stereotypes" by subjecting all employees to the same job requirements rather than disqualifying older people for presumed lack of "physical stamina" and "the ability to withstand stressful working conditions" without ever determining whether younger employees have such qualifications and in what measure. In the absence of minimum standards, "there is no essential qualification that age can stand as a proxy *for*."[22]

To hold that an employer must develop, implement, and enforce minimum standards in order to establish good health and fitness as BFOQs does not, as the Eighth Circuit has put it, "ignore ... the testimony of the ... expert witnesses as to the inadequacy of physical examinations and testing as methods of distinguishing between qualified and unqualified individuals over the age of sixty."[23] We do not impose on the MSTC or any other employer the burden of developing tests that perfectly distinguish the fit from the unfit or the healthy from the unhealthy. Contrary to what our colleague Judge Jones suggests in her concurrence, we also do not require law enforcement agencies to adopt minimum standards foreign or peripheral to their missions. Neither the Age Discrimination Act nor this court mandates that employers adopt any standards, minimum or otherwise, unless the employers seek to justify an early retirement program on the basis of health and fitness qualifications. It is the MSTC itself that argues that "physical stamina and the ability to withstand stressful working conditions" are reasonably necessary to the central tasks of scales enforcement officers.

We simply hold that in the absence of *any* minimum standards or *any* attempt to monitor employees' health and fitness, an employer fails to lay a factual foundation upon which a court may rest a finding that specified degrees of physical stamina or the ability to manage stress are reasonably necessary to the essence of the business. An employer may not rely on health and fitness qualifications to retire older officers if it does not seek to maintain minimum levels of these qualifications among younger ones. Thus, the district court erred in finding that the MSTC had established reasonably necessary job qualifications without first determining whether the MSTC had set minimum standards.

The MSTC argues that this court's decision in *EEOC v. University of Texas Health Science Center*[24] demonstrates that we do not require a "particularized, factual showing"[25] of specific health and fitness qualifications in cases involving law enforcement officers. In *Health Science Center*, we approved a maximum hiring age of 45 for campus police in the University of Texas system, affirming the district court's finding that "older individuals lack the acute physical and mental agility and stamina required to serve effectively as rookie campus officers."[26] The panel did not specify what levels of physical and mental agility and stamina were required for completing the required law enforcement training course but noted that the course was rigorous and dangerous for trainees over 45.[27] It is of course possible, nonetheless, that minimum standards were in place.

*Health Science Center* was decided before the Supreme Court made clear in *Criswell* that an employer must show that "a job qualification has been carefully formulated to respond to documented concerns

---

21. *Id.* at 1401.

22. *Id.* at 1402 (emphasis in original).

23. *Missouri State Highway Patrol,* 748 F.2d at 454.

24. 710 F.2d 1091 (5th Cir.1983).

25. *Johnson v. Mayor and City Council of Baltimore,* 472 U.S. 353, 105 S.Ct. 2717, 2722, 86 L.Ed.2d 286 (1985).

26. 710 F.2d at 1094.

27. *Id.* at 1095.

for public safety."[28] The Supreme Court emphasized that the ADEA is based on empirical fact: "[T]he process of psychological and physiological degeneration caused by aging varies with each individual."[29] The panel in *Health Science Center* accepted as not clearly erroneous a finding that "acute physical and mental agility and stamina" were reasonably necessary to the business of campus police, although these qualifications might be too vague to stand under *Criswell* or *EEOC v. Mississippi.* The *Health Science* court, however, rested its affirmance on an independent finding by the district court that, on college campuses, "younger officers are needed to understand and relate to potential offenders and to prevent minor occurrences from erupting into major ones."[30] This court found the ability to relate to young people "in no way tangential to [the officers'] ... primary task of insuring the safety and protection of the campus community."[31] No job qualification involving the ability to relate to the young arose in *Criswell,* in the Mississippi conservation officers' case, or in this case. Thus *Health Science Center* rests at least in part on a BFOQ entirely distinct from that at issue in the later cases involving law enforcement or public safety.

### III.

Our holding that an employer must develop, implement, and enforce minimum standards in order to rely on health and fitness as BFOQs does not dispose of this case. We have yet to determine whether the MSTC established and maintained such standards, and we must do so without a preliminary finding by the district court to guide us. Because the EEOC tried the case on the theory that the law required a showing of minimum standards, however, the record is exhaustive and a remand is unnecessary on this point.

The MSTC asserts that it maintains minimum standards of health and fitness among scales-enforcement officers. It points to sections of the Mississippi Code in which the legislature announces its intent "to provide for the coordination of training programs for law enforcement officers and to set standards therefor"[32] or authorizes the State Board on Law Enforcement Training to "fix other qualifications for the employment of law enforcement officers, including ... physical and mental standards."[33] These statutes express a legislative endorsement of the development of minimum standards without actually formulating any. Acting under the authority of these sections, the Board on Law Enforcement Training issued a directive that applicants for law enforcement jobs must present "[p]roof of a recent physical examination by a licensed medical doctor reflecting mental and physical well being."[34] Similarly, the MSTC included in its description of the scales officer's job the caveat that applicants "must be found, after examination by a licensed physician or surgeon, to be free from any physical, emotional, or mental conditions which might adversely affect exercising the powers or duties of an enforcement officer."[35] Such pronouncements are too general and vague to constitute minimum standards under the ADEA.[36]

The MSTC relies also on the qualifications for entrance into the Law Enforcement Academy, which all newly hired scales-enforcement officers now attend. An applicant to the Academy must produce from his own physician a report on his health and physical condition, including information on his weight, height, hearing, sight, as well as EKG results and a blood

28. *Criswell,* 472 U.S. at 419, 105 S.Ct. at 2754. *See also id.* at 414 n. 19, 105 S.Ct. at 2751 n. 19.

29. *Id.* at 409, 105 S.Ct. at 2749.

30. 710 F.2d at 1095.

31. *Id.* at 1096.

32. Miss. Code Ann. § 45–6–1 (1972).

33. Miss. Code Ann. § 45–6–11 (1972).

34. Defense Exhibit 9(A).

35. Defense Exhibits 7(A)-(D).

36. *See Criswell,* 472 U.S. at 414, 105 S.Ct. at 2751 n. 19; *EEOC v. Mississippi,* 654 F.Supp. at 1180, *aff'd,* 837 F.2d 1398.

pressure reading.[37] The standard form notifies the physician of 38 activities that will be expected of officers, including driving emergency vehicles, lifting and carrying up to 70 pounds, climbing ladders, and subduing prisoners.[38] The form also specifies that officers may work under conditions involving long hours, exposure to extreme temperatures, and working remote from emergency medical assistance.[39] Finally, the form instructs the doctor:

> Law enforcement officers are required to participate in vigorous self-defense and firearms training and daily physical exercises during Basic Training. This includes daily calisthenics and running a self-paced minimum 1½ miles before completion of the training course. Any physical conditions which might prevent an officer from engaging in such physical activity should be carefully evaluated. Any physical condition which might jeopardize an officer's safety during training should disqualify that officer from training until the condition can be corrected.[40]

The physician must certify that the patient is physically able to perform the duties of an officer and to participate in basic training. Once at the Academy, trainees must complete 22 hours of "physical fitness and conditioning," 30 hours of "unarmed defense and arrest techniques," and 16 hours of "driver training" during the eight-week course.[41]

We note initially that the qualifications for entrance into the Academy and for completion of the course are identical for scales-enforcement officers and conservation officers, and that in the conservation officers' case we affirmed the district court's finding that these do not constitute minimum standards.[42] This precedent is not dispositive, however, because the district court's finding in the earlier case was protected by the clearly erroneous rule [43] whereas in this case we proceed without a finding on minimum standards. Nevertheless, the factors militating against a finding of minimum standards in the earlier case [44] are also at work here.

Although the physician's certification form sets forth reasonably specific and detailed qualifications, the MSTC's and the Academy's practices belie any commitment to maintain or enforce these qualifications. The Academy has accepted and graduated officers, subsequently hired by the MSTC, whose physicians neglected to include EKG results on the form [45] or noted under "abnormalities" that the patients were obese [46] or suffered from hypertension or high blood pressure.[47] The Academy has graduated and the MSTC has hired officers who failed the physical fitness and conditioning course [48] or the driving course.[49] Moreover, Dr. Marx, chairperson of the MSTC, testified that the Commission does not require the Academy to forward the officers' medical certificates to the Commission. As a result, the MSTC operates without any specific information about the officers' medical conditions or histories.

More important than any of these factors, however, is that the MSTC conducts *no* fitness or health programs or tests after hiring an officer to determine whether he remains competent to serve. When an officer is on sick leave for more than three days, he must submit a doctor's note stating that he was ill, but the note need not state that he is fit to return to work. To hire officers who are both obese and have high blood pressure and to require no regular physical examinations or

---

37. Defense Exhibit 8.

38. *Id.*

39. *Id.*

40. *Id.*

41. Defense Exhibit 6.

42. *EEOC v. Mississippi*, 837 F.2d at 1402.

43. Fed.R.Civ.P. 52(a).

44. *See EEOC v. Mississippi*, 654 F.Supp. 1168.

45. Plaintiffs' Exhibits 90–B and D.

46. Plaintiffs' Exhibits 91–A, B, D, E, and F.

47. Plaintiffs' Exhibits 91–E, 90 A–C, I.

48. Plaintiffs' Exhibits 93–J and K, 1–I.

49. Plaintiffs' Exhibits 93–E, 1–I.

fitness training betrays a serious lack of concern for their cardiovascular health. However stringent the qualifications for admission into the Academy—and we have indicated that the actual adherence to these qualifications was less than strict—the MSTC would be hard pressed to justify a mandatory *retirement* age without showing that it continues, somehow, to monitor the health and fitness of its employees. An arduous training program for rookies may be relevant to defending a maximum hiring age such as that at issue in *Health Science Center,* [50] but evidence of the continuing (or deteriorating) health and fitness of the workforce is far more probative in a case involving a mandatory retirement age.

The MSTC advances two reasons for its failure to monitor health and fitness. It refers this court to Miss.Code Ann. § 45–6–11 which provides in relevant part:

Law enforcement officers already serving under permanent appointment on July 1, 1981, shall not be required to meet any requirement of subsections (2) and (3) of this section [regarding minimum "physical and mental standards"] as a condition of continued employment; nor shall failure of any such law enforcement officer to fulfill such requirements make that person ineligible for any promotional examination for which that person is otherwise eligible.

This "grandfather clause" may explain why the Commission does not require its more senior employees to meet minimum health and fitness standards, but the clause does not explain why the MSTC fails to subject any of its incumbent officers to minimum standards, whether or not they were hired before July 1, 1981. The MSTC next argues that it cannot monitor health and fitness because the officers are geographically dispersed throughout the State and gathering them together at a central

location for testing would be impractical. We do not suggest, however, that monitoring must take place at a central location. The Academy now requires medical certificates, containing much crucial information (if properly filled out), from each applicant's own physician. We do not see why a similar requirement of regular medical certifications after hiring would demand inconvenient or expensive travel. Moreover, the Commission already groups its officers together at five locations throughout the state for weapons-qualification tests every six months. If a gathering is necessary, it is difficult to imagine why these occasions do not provide an opportunity.

A review of the evidence thus leaves us with the firm conviction that the MSTC has not developed, implemented, and enforced minimum standards that might justify a finding that health and fitness qualifications are reasonably necessary to the essence of the Commission's business. Because the Commission has not met its burden under the first prong of the *Tamiami/Criswell* test, and therefore cannot establish a BFOQ, we express no opinion concerning the second prong of the test.[51]

The judgment of the district court is REVERSED, and the case is REMANDED for a determination of the amount of backpay due to officers retired involuntarily.

---

EDITH H. JONES, Circuit Judge, specially concurring:

Although Judge Rubin's opinion is thorough and well-written, I concur in today's decision only because its result is dictated by the factually and legally similar case of *EEOC v. Mississippi,* 837 F.2d 1398 (5th Cir.1988). Were I writing on a clean slate, however, my analysis and probably my result [1] would follow that of the two courts

---

**50.** 710 F.2d 1091.

**51.** *See EEOC v. Mississippi,* 837 F.2d at 1402.

**1.** The First Circuit and Eighth Circuit cases addressed the mandatory retirement of city police officers and state highway patrol officers who constantly faced situations life-threatening to themselves and to the public. Here, however, we are reviewing the mandatory retirement of

scales enforcement officers whose involvement in life-threatening situations, according to the record, is the exception rather than the rule. The distinction could be significant. I do not find it necessary to review the district court's determinations independently at this stage, except to note that the "clearly erroneous" rule applies to its findings of fact.

of appeals which, unlike ours, have not required law enforcement employers to develop, implement, and enforce minimum fitness standards before their alleged qualifications can be deemed "reasonably necessary." *Compare EEOC v. Pennsylvania*, 829 F.2d 392 (3rd Cir.1987) (minimum standards required), and *EEOC v. Mississippi*, 837 F.2d 1398 (5th Cir.1988) (same), *with EEOC v. City of East Providence*, 798 F.2d 524 (1st Cir.1986) (minimum standards not required), and *EEOC v. Missouri State Highway Patrol*, 748 F.2d 447 (8th Cir. 1984) (same).[2]

In *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), the Supreme Court adopted the two-pronged test crafted by then-Chief Judge Brown in *Usery v. Tamiami Trail Tours*, 531 F.2d 224 (5th Cir.1976), in setting the scope of the BFOQ exception to the ADEA. First, the employer must establish that the job qualifications he invokes to justify age discrimination are reasonably necessary to the essence of his business. The purpose of the "reasonably necessary" prong is to serve as a basic check against qualifications so peripheral as to be non-essential to the job. Second, the employer must demonstrate that he is compelled to rely on age as a proxy for the essential job qualification validated by the first inquiry. The second prong can be proven by establishing either (a) that the employer had reasonable cause to believe that all or substantially all persons over the age qualification would not be able to perform the duties of the job safely, or (b) that it is highly impractical to deal with the older employees on an individualized basis. The second prong ensures that age is the necessary proxy for the

essential job qualification. *EEOC v. Mississippi*, 837 F.2d at 1400–01 (discussing *Criswell*).

Following *EEOC v. Mississippi*, the central issue here becomes the type of proof needed to satisfy the "reasonably necessary" prong of *Tamiami*. Our prior panel noted that employers are entitled "to exercise substantial discretion in judging the reasonableness of safety-related job qualifications," and that in *Tamiami* we had held that "employers are entitled to substantial discretion in judging the reasonableness of qualifications[.]" *Id.* Relying on *EEOC v. Pennsylvania*, 829 F.2d 392 (3rd Cir.1987), however, our court then held that age qualifications will not survive the "reasonably necessary" inquiry absent the development, implementation and enforcement of minimum standards of employee fitness. *Id.* at 1401–02. It is this addendum to the *Tamiami* test—or at least to the first prong— that causes me to write separately.

By focusing on "minimum standards" in a case involving active law enforcement duties, we are, I believe, missing the forest for the trees. Fitness for engaging in law enforcement is not merely a matter of being able to pass certain strength, aerobic capacity, and coronary fitness tests and to maintain overall good health. It requires endurance, fast reflexes, and mental and physical flexibility, as the testimony here indicated and the district court found. "Minimum standards" as required by our amendment of *Tamiami* do not necessarily correlate with or replicate the job duties of law enforcement, and to that extent, they are a potentially misleading gauge of what is "reasonably necessary".[3] In practice,

---

**2.** *Cf. Heiar v. Crawford County*, 746 F.2d 1190 (7th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985) (Court did not expressly require minimum standards; in reviewing "weak" evidence under "clearly erroneous" standard, however, the panel mentioned more than once the employer's failure to require annual or periodic physical examinations.).

**3.** Congress has recognized that law enforcement jobs may be particularly susceptible to mandatory retirement policies, in its report on the BFOQ amendment to the Age Discrimination in Employment Act:

For example, in certain types of particularly arduous law enforcement activity, there may be a factual basis for believing that substantially all employees above a specified age would be unable to continue to perform swiftly and efficiently the duties of their particular jobs, and it may be impossible or impractical to determine through medical examinations, periodic reviews of current job performance and other objective tests the employees' capacity or ability to continue to perform the jobs safely and efficiently.

S.Rep. No. 95–493, 95th Cong., *reprinted in* 1978 U.S.Code Cong. & Ad.News 504, 513–14 (legislative history).

the minimum standards requirement imposes a considerable burden on the Mississippi State Tax Commission and other law enforcement agencies. The cost of developing and implementing physical fitness training or monitoring will not be insignificant, especially for a state-wide agency whose employees are widely dispersed. The costs of the program will almost surely be diverted from the agency's principal mission of law enforcement. Moreover, once the standards are in place, agencies will have to decide how to enforce them. In order to prove the validity of "minimum standards," for instance, must they fire or discipline experienced officers who gained 20 pounds or developed controllable arthritis or ran a mile in 10 minutes rather than 8:30? Such a program would disportionately elevate "minimum standards" over actual job performance and could easily disrupt morale among the law enforcement officers. It is akin to requiring every legal secretary in a law firm to demonstrate her proficiency in typing Latin. The First Circuit neatly explained the dilemma imposed on such employers by the minimum standards shibboleth:

> The ADEA was intended to be used as a shield to protect older employees from discriminatory employment practices, not as a sword to compel employers concerned with public safety to perfect their procedures for assuring the maximum physical fitness of younger employees.

*EEOC v. City of East Providence,* 798 F.2d 524, 529 (1st Cir.1986) (footnote omitted).

Equally significant, it seems to me, is that neither *Criswell, Tamiami* nor legislative history requires an employer to prove the first *Tamiami* prong by means of "minimum standards." Whether a job qualification is reasonably necessary to the essence of the employer's business focuses in plain language on the actual job duties and conditions rather than qualifications "peripheral" to the "central mission" of the employer. *Criswell,* 105 S.Ct. at 2751. Although the analysis of the reasonable necessity of particular law enforcement qualifications, *e.g.,* physical stamina and fast reflexes, must be determined in each case from objective evidence and not merely the employer's opinion, the presence or absence of physical "minimum standards" should not substitute for the real job duties. Again, the First Circuit well expressed the evidentiary significance of such criteria:

> But a police force's failure to monitor physical standards does not, standing alone, compel a finding that physical fitness is not a reasonably necessary job qualification. Such laxity may merely show that, because of inertia or outside pressures, the present leaders of the department are putting up with lower standards than properly they should.

*EEOC v. City of East Providence,* 798 F.2d at 530. Moreover, to rest the first prong of *Tamiami* on the development and enforcement of minimum standards effectively severs from the second prong of *Tamiami* the employer's option to prove that age is a valid proxy by establishing that individual determinations are impossible.

I would not deny that "minimum standards" have a proper place in applying the BFOQ defense in age discrimination cases. Their existence or non-existence may be one factor considered by the court in determining whether job qualifications are reasonably necessary to the essence of the employer's business. *Compare Heiar v. Crawford County,* 746 F.2d at 1198–99. I would also rely on an employer's application of "minimum standards" such as periodic medical examinations as evidence under *Tamiami*'s second prong, which calls for a logical nexus between age and the job qualifications of the employer.[4]

---

**4.** Cf. *EEOC v. Mississippi,* 837 F.2d at 1402: It is likely that Mississippi's age qualifications for game wardens would have passed muster had the Mississippi legislature "developed, implemented and enforced" **minimum standards** of health and fitness <u>and shown that nearly all conservation officers over age sixty</u> <u>could not meet those standards or that individual determinations were impossible.</u> Since the Supreme Court's concerns would have been satisfied, our task would have been simply to defer to a decision by a competent authority. That did not take place, however; and because it did not, there is no essential

In *Criswell,* the Supreme Court established a fact-intensive standard for effectuating Congress's intent that mandatory retirement should be eliminated except where it is objectively necessary to insure adequate job performance. Furthermore, both *Criswell* and *Tamiami* advise us to interpret and apply the tests on a case-by-case method. *Criswell,* 105 S.Ct. at 2750. The test adopted by our court in *EEOC v. Mississippi* extends the significance of one piece of evidence, minimum standards, well beyond the demands of *Criswell* and *Tamiami.* In so doing, I believe it also undermines the intent of Congress in passing the admittedly narrow BFOQ defense. Congress could have required employers to maintain minimum standards of health and fitness for particular jobs, or it could have outlawed all mandatory retirement. It did neither. Our decision, in my view, goes far toward doing both.

job qualification in this case <u>that age can stand as a proxy for</u>. (Bolding in original, underlining added.)